Abel **CHAVEZ**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16598.**

United States Court of Appeals
Ninth Circuit.

Jan. 29, 1960.

Max Solomon, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Robert John Jensen, George W. Kell, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS and BARNES, Circuit Judges, and JAMESON, District Judge.

BARNES, Circuit Judge.

Appellant was convicted on the fourth count of a nine count indictment. His two sisters, Sarah Montellan and Jenny Chavez, also known as Jenny Quinones, as well as his brother-in-law Albert Montellan, were each convicted of various counts.

In order to understand the factual situation here existing, a consideration of the various counts of the indictments is necessary. For convenience, we will refer to the defendants by their first or nicknames, as was usually done by witnesses and counsel at the trial.

Under count one, Berto and Jenny were convicted of the sale of heroin on October 10, 1958, to one Flores, a government agent. Under count two, Berto and Jenny were convicted of a similar sale to another government agent on October 28, 1958. Under count three, Berto, Sarah and Jenny were convicted of selling heroin to a government agent on November 6, 1958. Jenny was convicted under count six of making the telephone call which facilitated the sale charged in count one. Jenny was convicted under count seven of making the telephone call facilitating the sale charged in count two. In count eight, Jenny was convicted of making the telephone call facilitating the sale charged in count three, and in count nine, Jenny was convicted of making the telephone call facilitating the commission of the conspiracy alleged in count four of the indictment.

Count four alleges a conspiracy between Berto, Sarah, Jenny, and one Delia Mendoza, an unindicted co-conspirator, to conceal, transport and attempt to sell heroin on November 13, 1958.

Count five alleges a separate conspiracy, and for the first time brings appellant Abel Chavez into the cast of characters. The conspiracy alleged that Berto, Sarah, Jenny, appellant and John Doe, an unindicted co-conspirator, from April 1, 1958 to January 1959 conspired to conceal, sell, transport (and facilitate the concealment, sale and transportation of) narcotic drugs (heroin) into this country.

The overt acts alleged in count five are (1) all those alleged in counts one to four, and six to nine; (2) the importation of heroin on May 11, 1958; (3) that on that said date appellant and Delia Mendoza (not an indicted or named conspirator in the count five indictment) cared for Berto and Sarah's children while they (Berto and Sarah) imported heroin into the United States; and, (4) repeated telephone calls between co-conspirator John Doe and the defendants, in particular, calls between John Doe and Jenny on March 10, 1958, between John Doe and Sarah on or about September

1958, and between John Doe and appellant Abel Chavez on or about September of 1958. Counts one to five were allegedly violative of 21 U.S.C.A. § 174; counts six to nine violative of 18 U.S.C. § 1403. After trial by jury, all defendants were convicted on all counts. Defendants Berto, Sarah and Jenny were sentenced on each count to five years imprisonment, to be served concurrently; appellant was sentenced to fifteen years imprisonment on his one count conviction. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction on appeal. 28 U.S.C. § 1291.

Appellant here urges error committed by the trial court (1) in permitting the testimony of the witness Peterson as to a conversation with appellant on September 5, 1958 (subsequent to his arrest) respecting appellant's possession of $2,000; (2) error of the court in instructing the jury to disregard certain testimony "if you can"; (3) error in denying motion for acquittal made at the close of appellant's case and at the close of all testimony, and error in denying motion for new trial, all based on the insufficiency of the evidence.

The principal witness in the case against all defendants was the unindicted co-conspirator of count four, Delia Mendoza (hereinafter referred to, for convenience, as Delia), who admittedly was appellant's "girl friend" and saw much of appellant during the time here involved, although the latter was a married man. Delia had had contact with a narcotics officer of the Los Angeles Sheriff's Department and had agreed to act as an undercover agent and furnish him certain information with regard to the traffic in narcotics. This she did not do, but instead herself arranged for the sale of narcotics which are the subject of this federal prosecution. She handled the money and arranged the deliveries. Such sales were allegedly made without Delia profiting thereby. Her testimony, if believed, clearly not only implicates herself, but Jenny, in facilitating sales, and Berto and Sarah in the possession, transportation, and sale of heroin. Berto, Jenny and Sarah denied their alleged parts, but at best, their testimony created a conflict in the evidence, decided adversely to them by the jury's verdict. Neither Berto, Jenny nor Sarah have appealed their convictions.

We have carefully gone over the record on the appeal. Nowhere is there evidence that appellant ever had possession, actual or constructive, of any heroin, with two possibly arguable exceptions.[1] We agree with appellant's counsel when he states:

"Insofar as appellant is concerned, Delia did not state that he touched, possessed, sold, delivered or even knew of any of the narcotics she sold or that he conspired with her or anyone else in connection with

---

[1] The first possible exception appears in Delia's testimony when she and the appellant returned from church on Mother's Day, May 11, 1958, to the home of Jenny Chavez. She, Delia, saw in Jenny's kitchen a newspaper with some coffee-colored substance on it on the kitchen table, together with some rubber contraceptives. On that date, Delia did not know this coffee-colored substance was narcotics, but was later told that fact by Jenny. Delia first learned "about it" when she spoke to the Los Angeles Deputy Sheriff, then Delia "kept asking" Jenny and Jenny "started to tell" Delia. How long this was after May 11th, 1958, does not appear in the evidence. There is no testimony that appellant's attention was called to what was on the kitchen table, nor that he saw it, or was in the kitchen, or that he did more than enter a house which was not his own, on one table in the kitchen of which house was narcotics.

The second instance which might indicate a knowledge on the part of appellant of a traffic in narcotics, was the testimony of Delia that one night in October 1958 when Delia, appellant, and one Harry Weiss were in an automobile, Delia saw some of "those rubbers" and that "Bobby" (apparently referring to Weiss) said, "We'd better get moving before we get busted with this stuff."

Thus, no witness testified to any actual possession of narcotics by or in the appellant, and there was no proof beyond a reasonable doubt of any constructive possession.

said sales. On the contrary, Delia stated on direct examination, regarding the first sale, that Albert Montellan came to Jenny's house in response to her telephone call for narcotics for Delia to sell and, 'First thing he asked me is how about if Abel (appellant) finds out' and she told him 'Well, he won't find out unless you tell him.'

"On cross-examination Delia testified that in October 1958 government agents asked her if she was getting narcotics from appellant and she told them no; that it was from Berto (Albert Montellan). That before the time of the first sale to Flores she never sold narcotics to anyone else."

(Appellant's Opening Brief, p. 5.)

As to the overt acts alleged in count five, in addition to all the other acts alleged in counts one to four and counts six to nine, are the following: (1) The importation of narcotics on May 11, 1958 by Berto and Sarah; (2) the baby-sitting on that day by appellant with Berto's and Sarah's children; (3) three telephone conversations with unindicted co-conspirator John Doe of Tijuana, Mexico, the one call in September 1958 allegedly being with appellant.

No evidence whatsoever was introduced as to the fact or content of appellant's alleged conversation with John Doe of Tijuana in September 1958. John Doe was never identified. The government called as a witness an office supervisor for a telephone company who established that calls were placed from the telephone located at the residence of Berto and Sarah Montellan to Mexicali, Mexico, on August 21, 1958, October 14, 1958, December 1, 1958 and January 5, 1959. There was no proof of any telephone call to Tijuana, Mexico, nor any proof of any telephone call anywhere in September 1958. Thus, there was no testimony introduced to prove appellant's participation in any manner in this alleged overt act.

As to overt act (1) above, the importation of heroin on May 11, 1958 was attempted to be proved by Delia's statement that Jenny had told her so after the fact. That appellant, with Delia, baby-sat on May 11, 1958 is not denied. That appellant so baby-sat with knowledge that the children's parents were to import heroin on that day is allegedly proved by a conversation after the fact between Delia and Jenny.[2] Thus, the record does not disclose when Delia first knew that when she and appellant baby-sat, Berto and Sarah did not go to Mex-

2. "Q. By Mr. Kell: Did you and Abel Chavez babysit then on some day when Albert and Sarah went to Mexico? A. Yes, we did.

"Q. Did you—

"The Court: As I understand it, counsel, you see if I am right.

"All you know is that you baby sat while you understand they went to Mexico, is that right?

"The Witness: No, sir. Sarah asked Abel, his brother, if we could babysit while she and Berto was going to go see her mother—his mother.

"The Court: But you didn't go to Mexico with them?

"The Witness: No, I didn't.

"The Court: All you know is what they told you?

"The Witness: That's right.

"Q. By Mr. Kell: Now, did you on that date know why they went to Mexico? A. Yes, after, after I found out from Jenny, because Jenny had told me.

"Q. Now, wait a minute. You said you found out from Jenny. Did you find out that same day or did you find out later? A. Later.

"Q. Who was present when you and Jenny discussed this, if anyone? A. Nobody.

"Q. Do you remember the approximate date when you had this conversation? A. No, I don't.

"Q. Where was it? A. In her house.

"Q. Now, tell us what was said. A. She told me that while I was babysitting that she went to get some drugs for herself, meaning Sarah, and that she was going to go the next day and get some for Abel.

"Q. Now, was she referring to the day when Sarah and Albert went to Mexico? A. Yes, that's right.

"Q. Did you have any further conversation about their activities at that time? A. No."

Tr. pp. 53–54.

ico to see Berto's mother, but that they went to get drugs. There is no proof that Abel knew of this conversation or of the alleged importation, or even received or saw any of such drugs. There is no proof that any such drug was actually imported on May 11, 1958.

■■ It is true that an overt act in itself may be a perfectly innocent act standing by itself. In criminal law an overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime. The baby-sitting was an innocent act which could not become an overt act unless the appellant looked to it to aid in the accomplishment of the crime. Cramer v. United States, 1945, 325 U.S. 1, 7, 65 S.Ct. 918, 89 L.Ed. 1441. Thus while the telephone call, one of the two overt acts charged against appellant, was totally unproved, the second overt act charged, the baby-sitting, was proved as an act, but it was not proved that it was an act in furtherance of the conspiracy alleged. Neither alleged overt act was withdrawn from the jury. The jury was permitted to speculate as to appellant's guilt based upon charged overt acts as to which there was no evidence in the record.

■■ Of course, simply because the overt acts charged against appellant are not proved, does not mean he could not have been proved otherwise an active participant in the conspiracy by other sufficient proof. Though not much evidence is demanded quantitatively to prove a "facilitation" of the sale of narcotic drugs, cf. Pon Wing Quong v. United States, 9 Cir., 1940, 111 F.2d 751, it requires *some* knowledge, explicit or implied, in each defendant of the principal purpose of the conspiracy, and *some* act or action indicating participation therein. The established fact of the existence of the conspiracy may well be proved by circumstantial evidence. United States v. Manton, 2 Cir., 1938, 107 F.2d 834, 839. And, of course, it is not necessary that each co-conspirator be aware of all the details of the conspiracy. Each co-conspirator need not participate in an overt

act nor know the part the other conspirators are to play, nor even know who all of them are. United States v. Rosenberg, 2 Cir., 1952, 195 F.2d 583, 601. But here there is an utter lack of any proof of any participation by appellant in any of the substantive counts of either conspiracy.

The government seeks to bolster its case against appellant by urging us to consider two matters:

(1) That the conversation between Delia and Berto (wherein Berto asked Delia "How about if Able finds out?" and Delia told Berto, "Well, he won't find out unless you tell him." (Tr. 63, l. 14) —a conversation relied upon by appellant to show that he had no knowledge of the alleged sales and conspiracy—not only fails to prove that appellant was left out of the conspiracy and had no knowledge of it, but it shows that Delia and Berto "were worried about what appellant would do to them if he found out about a sale taking place without his authority." Two inferences can be drawn from the declaration of Berto (urges appellee):

> "*One:* that appellant was to have no knowledge of the transaction; and *Two:* that the appellant was not to have knowledge of the transaction *because* the declarant, Montellan, feared that appellant would react unfavorably if appellant knew of the sale. The latter inference seems to be the more reasonable * * * that appellant was the man in authority in the conspiracy and that all sales had to be cleared with appellant before being made."

Such an argument could at least be made if there existed *some* other proof of appellant's participation in the conspiracy. But this two-way inference cannot be used to establish the very conspiracy itself. Nor do we agree that the second inference drawn by the government should prevail. If both inferences are equally valid, appellant is entitled to that which favors him. Carter v. United States, 1956, 102 U.S.App.D.C. 227, 252 F.2d 608, 612–613; Ferris v. United

States, 9 Cir., 1930, 40 F.2d 837, 840. How would an illegal sale of narcotics be kept from "the man in authority," if he *were* part of the conspiracy? Would the government have this Court infer that appellant was so much in authority that his permission was required to effect a sale, but so little in authority that he did not know what quantity of narcotics had been imported, what was on hand, or what had been sold, and would not discover if a sale were made without his knowledge?

(2) We turn to the government's second position urged herein as some evidence of appellant's guilt; that he had $2,000 on him when arrested on September 5, 1958; that he had not been employed for four or five months; and that appellant refused to explain his possession of that money after his arrest, but stated: "You guys know what you are talking about. I am not going to say any more."

■ The government recognizes that a refusal to make a response to an accusatory statement *after arrest* cannot be taken as an admission. Sandez v. United States, 9 Cir., 1957, 239 F.2d 239. But here, says government counsel, appellant did not stand mute, but gave an answer which constituted "a circumstantial inference that appellant was refusing to talk only because he was guilty."

We do not understand how a direct refusal to exculpate oneself after arrest can be nonadmissible, while an inferential refusal to exculpate oneself after arrest can be.

Nor can we believe that the mere possession of a substantial but unidentifiable sum of money and a refusal to explain after arrest how it was acquired, *standing alone*, can prove participation in the conspiracy here alleged, or in any other conspiracy.

■ We conclude there was insufficient evidence of appellant's guilt to permit the matter to have gone to the jury in the first place. We reverse the judgment of conviction upon grounds of insufficiency of the evidence.

■ Appellant calls our attention to two other matters. One was the unfortunate remark made by the trial judge, characterized by appellee as "a verbal slip." The trial judge instructed the jury to disregard certain evidence, improperly placed in the record by the government, "if you can." In other words, the trial judge told the jury that they must disregard certain evidence they had heard, and in the same breath confided to them that he was doubtful if it was possible for them to do so. The law has long recognized the fact that it is difficult when in the courtroom for anyone, juror or not, to disregard that which he has heard. Yet, if evidence is improperly placed before the jury, the least a defendant can expect from the trial judge in correcting the error is a firm, definite, and unequivocal instruction to the jury that it is their duty to disregard it, absolutely and completely, and that it is his opinion they can and must do so. As disclosed by the circumstances of this case, the admonition given as it was by the trial judge, was worse than no instruction at all, and was prejudicial to appellant's right to a fair trial.

■ In addition the trial court apparently in the presence of the jury stated at the conclusion of the government's case as follows:

"The Court: Now counsel, I might as well make this statement. Without commenting on the evidence, I think that the testimony of the young woman (Delia Mendoza), if the jury wants to believe her testimony, there is evidence here to show that *all* these defendants are part of the conspiracy. Whether that is true or not is going to be a question of fact for the jury." (Emphasis added.)

While the remark was apt as to all defendants other than appellant, it was, as we have hereinbefore shown, utterly inaccurate as to appellant. Hence, it was prejudicial and erroneous.

The judgment of conviction is reversed.