THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK VINCENT, a/k/a Stanley Miller, *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 78-2022

Opinion filed December 30, 1980.

Lawrence Wolf Levin, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

A jury convicted defendants Frank Vincent, also known as Stanley Miller, and Richard Jenkot of calculated drug conspiracy and conspiracy for their trafficking in a controlled substance, phencyclidine (PCP). Vincent was sentenced to the penitentiary for 10 to 30 years for calculated drug conspiracy and 6 to 18 years for conspiracy, the sentences to run concurrently. Jenkot received a 10- to 30-year penitentiary sentence for calculated drug conspiracy and a 5- to 15-year sentence for conspiracy, also to run concurrently. A third co-conspirator, Edward Vaisvilas, pled guilty and testified for the State in exchange for the State's recommendation that he be given a 2- to 6-year penitentiary sentence. Vincent and Jenkot appeal, assigning as errors the admission of certain prejudicial evidence; giving of an erroneous instruction to the jury; restrictions placed upon defense counsel in closing argument; failure of proof as to Jenkot's involvement in the conspiracy; and several sentencing errors. For the reasons which will later appear, we affirm in part and reverse in part, and vacate the conspiracy sentences imposed on Vincent and Jenkot.

The State's principal witness at trial was Sergeant Terry McCue of the Chicago Police Department. McCue testified that he was assigned in early 1976 to the Area 3 Youth Division and worked undercover on narcotics cases. He first saw Jenkot in a West Grand Avenue tavern on January 28, 1976. He told Jenkot that he was interested in buying "quantities" of PCP. Jenkot told McCue he had access to "multiple ounces of PCP and almost any kind of drug" McCue might want, and gave McCue his telephone number. On February 12, 1976 McCue saw Jenkot in the same tavern in company with Edward Vaisvilas. McCue offered to purchase two ounces of PCP from Jenkot, which the latter said he could "do," for $1,400. Vaisvilas added that the people he dealt with could "do large quantities." McCue responded that "his guy" could buy a minimum of one-quarter to one-half pound of PCP.

Twice thereafter McCue contacted Jenkot and offered to buy one ounce of PCP. The first time, on February 13, Vaisvilas met McCue and sold him one ounce of PCP for $700, outside a restaurant at Belmont and Western Avenues. On March 2, Jenkot himself sold McCue an ounce of PCP for $700 at Cicero Avenue and 22nd Place in Cicero, Illinois. On

March 6, 1976, McCue testified, he told Vaisvilas that he was in contact with "large quantity" buyers and wanted to talk directly with Vaisvilas' "guy." Vaisvilas telephoned McCue on March 7 from his "guy's" house on a telephone conference hookup. McCue stated that he knew a group of people who were interested in trading a trailer full of Zenith television sets for five pounds of PCP. The voice of an unidentified male asked McCue how many television sets were involved and where the deal would take place. He then advised McCue that he would get back to him. On March 12 McCue again met with Jenkot and Vaisvilas. Jenkot asked McCue for $500 in return for having made arrangements for previous narcotics purchases and as an advance on a future deal that McCue was there to arrange, but McCue told him he would be taken care of when "the big deal went down." Prices for narcotics were discussed by the participants at this meeting as well as their failure to get together on the television set deal.

On March 23, McCue called Vaisvilas for a meeting and he, DEA[1] Special Agent Pat Collins, Jenkot and Vaisvilas met, ultimately going to the basement premises of a vault company located in a downtown building. There McCue removed a safety deposit box containing DEA money amounting to $50,000 in $100 bills. McCue told Jenkot and Vaisvilas that the $50,000 was his "guy's" money and that they were ready to "go." Vaisvilas responded, "dynamite." Jenkot then asked McCue for $500. McCue responded that Jenkot would be taken care of later. Vaisvilas agreed to sell four pounds of PCP in one-half-pound trans-actions, but McCue wanted to complete the sale in two steps. They parted with Vaisvilas telling McCue he would contact him after talking to his "guy." On March 29, McCue called Vaisvilas and said he was ready for a four-pound PCP buy. Vaisvilas took his telephone number and 20 minutes later a man identifying himself as "Sonny" called McCue at that number. McCue recognized the voice as that of the man he had spoken with during the conference call on March 7. Sonny said they "would do eight ounces a time up to four pounds" and that McCue "would call the shots." The deal was to be made through Vaisvilas, but Sonny would be close by. That evening, Jenkot called McCue and asked when the deal "was going down," and McCue responded the next day.

On the morning of March 30, McCue continued, he called Vaisvilas, who said they would "do a pound," an amount he said he thought had been worked out between McCue and Sonny. At 11 a.m., Vaisvilas called McCue and told him his "guy" was on his way in from McHenry and for McCue to get the money and meet at Vaisvilas' apartment. McCue later asked Vaisvilas to call Sonny for instructions as to the exact amount of money he was to bring. Vaisvilas agreed and asked McCue not to tell

---

[1] Federal Drug Enforcement Administration.

450

Jenkot that the deal was going down that day, because Jenkot was "whacked" and had been arguing with his "guy." Thereafter, McCue and other officers and special agents, including Collins and DEA Special Agent Kenneth Labik, prerecorded $10,000 in $100 bills for use in the transactions. At 12:15 p.m., Sonny called McCue and told him to bring enough money for "one" today. McCue, Collins and Labik went to meet Vaisvilas at his apartment. McCue and Collins went inside and, after discussion as to how the money was to be paid and the narcotics transferred, Collins went down to the car to Labik, ostensibly acting as McCue's "guy," and returned with $5,000 as "front" money, the $5,000 balance to be paid near the exchange site.

Vaisvilas and McCue left the apartment, according to McCue, entered the former's white van and were followed by Collins and Labik in McCue's undercover vehicle. They drove to the Eisenhower Expressway, then west to the Central Avenue exit ramp where they stopped. McCue alighted from the van telling Vaisvilas that he would wait in his car with the others on the opposite side of the expressway. Vaisvilas drove off in the van. After 15 or 20 minutes, he returned to where McCue was waiting with the others in the undercover vehicle. McCue left his car and walked toward the van. Vaisvilas showed him a cardboard box filled with plastic bags containing crystalline substances later identified as PCP. Vaisvilas removed the cardboard box from the van and, together with McCue, began walking back toward the undercover car. As they walked, a silver, four-door Lincoln Continental passed by, moving slowly, and Vaisvilas told McCue, "[t]here's my guy now. I got to meet him when I get the other half of the money." McCue identified the lone occupant in the Lincoln as defendant Vincent.

McCue and Vaisvilas then got into the undercover vehicle with the box of narcotics. McCue announced his office and placed Vaisvilas under arrest. A search failed to turn up the $5,000 given to Vaisvilas either on his person or in his van. McCue then drove the van onto the Eisenhower Expressway eastbound toward the Loop. At a point between 4900 and 4800 west, he stopped and observed other people stopped and coming out of their cars, citizens whose identities he did not know, running around and picking up $100 bills from the highway. He saw Chicago Police and DEA officers in the vicinity retrieving money. He observed passengers and crew getting off a CTA train which had stopped nearby, pick up some money, and jump back on the train which then left. He got back in the van and proceeded to the Federal Building where he again saw defendant Vincent under arrest. Agents Collins and Labik testified in substantial corroboration of so much of the evidence given by McCue as involved them.

Chicago Police Officer Lou Alvizu testified that he was assigned to

assist McCue in a narcotics investigation on March 30, 1976. In the vicinity of Central Avenue and the Eisenhower Expressway, he observed McCue's parked undercover vehicle. He saw a silver Lincoln Continental move by the undercover vehicle at a slow pace. He drove his own automobile alongside the Lincoln. As he did so, the driver turned, looked at him, made an immediate right turn onto the Eisenhower eastbound and accelerated to speeds from 70 to 80 miles per hour. Alvizu followed and when they reached a point in the vicinity of 4800 west and his car was about five feet behind the Lincoln, he observed Vincent open his window, extend his left arm outward and release a quantity of money into the air. Alvizu thereafter curbed the Lincoln and assisted in Vincent's arrest.

Chicago Police Sergeant Bruce Carter, on the same assignment, testified that he also arrived at the Eisenhower Expressway scene in time to see Vincent throw money out of his automobile window. He assisted in Vincent's arrest along with his partner, Officer Marilyn Bucey. When Carter told Vincent that he (Carter) could not have thrown the $5,000 out of the window, Vincent stated that it was the "hardest decision he ever had to make."

DEA Special Agent William Morley, on surveillance assignment on March 30, testified that he saw Vaisvilas carry a brown package from a silver Lincoln Continental to a white van in the vicinity of Central and Roosevelt Road. Both vehicles then proceeded to the Eisenhower Expressway at Central. The white van stopped near the undercover police vehicle. The Lincoln proceeded at high speeds onto the Eisenhower Expressway. Morley observed Vincent release a quantity of bills from his car. Morley participated in gathering the money from the expressway with other officers. In all, they recovered thirty-four $100 bills, which he returned to his office. He compared the serial numbers of the recovered bills with the list of prerecorded $100 bills given to McCue for purchase of the PCP, and all 34 recovered bills had been so recorded.

DEA Special Agent Steven Casteel, equipped with binoculars and assigned to surveillance from a helicopter on March 30, observed the silver Lincoln Continental intermittently that day. He stated the he first saw the automobile in the morning near U.S. Highway 12 at Volo, Illinois; next as it proceeded southward on Route 12 to Cicero, Illinois; thereafter as it entered Roosevelt Road and was parked in the 5700 west block; and later, when it parked further east on Roosevelt near Central Avenue, next to a white van. Casteel observed a person alight from the van and enter the Lincoln on the passenger side. He saw the Lincoln proceed down several side streets and then stop in an alley. The driver, who wore a multicolored T-shirt, left the Lincoln, opened the automobile trunk, removed a small brown object therefrom, and reentered the Lincoln. The

Lincoln was thereafter driven back to the white van, where the passenger got out and returned to the van. The van was then driven to a location near Central and the Eisenhower Expressway. The Lincoln thereafter entered the expressway at high speeds, later pulling off to the side. All traffic on the expressway came to a halt in that vicinity.

Chicago Police Officer Frank Geraci, assigned to surveillance duty on March 30, testified that he saw Vincent emerge from a house in Elk Grove Village, together with a man and a woman. Vincent placed a cardboard package in the trunk of his Lincoln and drove to the vicinity of West Roosevelt Road, dropping off the male passenger at 58th Street and the female passenger on South Central Avenue. The car was then driven to the 5800 block of West Roosevelt Road where it was parked. Geraci saw Vincent enter a tavern near there, and thereafter saw him leave, at about 2:30 p.m.

Edward Vaisvilas, one of the three co-defendants, testified for the State. He sold PCP from December, 1975 until March 30, 1976. He corroborated much of the testimony given by McCue and other of the State's witnesses, and added certain information. At Jenkot's direction, he sold one ounce of PCP, previously secured from Vincent, to McCue on February 13 for $700. He gave Vincent $600 from McCue's payment, and $50 to Jenkot. He knew Vincent as "Sonny." When he told Vincent of McCue's proposed stolen television set transaction, Vincent told him to get McCue's telephone number and come to Vincent's home in Elk Grove Village the next day from which they woud call McCue. They did so the next day and McCue asked Vincent if he coud get rid of the television sets and that he wanted $45,000 for them. Vincent declined.

Vaisvilas, with Jenkot, next met McCue on March 23 and, at McCue's invitation, they went to a vault and observed $50,000 in a safety deposit box. At this time, Jenkot agreed to deliver four or five pounds of PCP to McCue for $50,000; Jenkot wanted to set up the deal. On March 27 and again on March 29, Vaisvilas had conversations concerning the transactions with McCue by telephone. After the latter conversation, Jenkot told Vaisvilas that McCue's telephone number checked out to a tavern across the street from a police station at Belmont and Western Avenues. He asked Vaisvilas not to give Sonny this information because he would get "all shook up" and "screw everything up." On the next morning, Vaisvilas called McCue and asked him to leave Jenkot out of the mechanics of the final deal because Jenkot had a tendency to get "whacked," but to give him his $1,000 share anyway.

After substantially corroborating McCue's description of the events that took place at his apartment on the morning of March 30, Vaisvilas testified that when McCue got out of his van on the Central Avenue exit ramp near the Eisenhower Expressway, Vaisvilas drove to a tavern in the

5700 block of West Roosevelt Road. He met Vincent, entered his silver Lincoln Continental parked in front of the tavern, and, as they rode together, Vaisvilas set the $5,000 given to him by McCue on the center console. Vincent said that "he did not like it. It's a cop setup," but decided to go through with the deal anyway. He stopped his car in an alley, removed a cardboard box from the trunk and brought it back to Vaisvilas, who, after examining the contents, asked if they were giving McCue a whole pound at one time. Vincent said yes, and drove him back to his van. Vaisvilas drove to where McCue's undercover vehicle was parked. His testimony concerning the events which took place thereafter closely tracked the accounts given by McCue, Collins and Labik. In January 1976, Jenkot had told him that McCue was a potential "quantity" buyer. Vaisvilas then told Jenkot that he would give 40 percent of his $1,000 profit from the sale to Jenkot.

Testimony was given by forensic chemist Richard Jelsomino, another State's witness, who performed chemical analyses of all the powdery substances received from Jenkot, Vaisvilas and Vincent. He found that those substances contained PCP, an animal tranquilizer used by veterinarians, and by others as an hallucinogenic. Testimony given by other witnesses will be described later in the opinion, as necessary.

At the close of the State's case-in-chief, defendants' motion for a directed verdict was denied. The defense rested without presenting any evidence. The jury found Jenkot and Vincent guilty of the charges first noted in this opinion. Both Jenkot and Vincent had also been charged with delivery of a controlled substance; however, the jury found Jenkot not guilty of that charge and was deadlocked on the delivery charge against Vincent. A mistrial on the latter delivery charge was declared. After defense motions in arrest of judgment and for a new trial were denied, Jenkot and Vincent elected to be sentenced under the prior law, and were sentenced, also as first noted above. Thereafter, the State *nolle prosequied* the delivery charge as to Vincent. This appeal followed.

## I.

Defendant Vincent first contends that he was denied a fair trial by the admission into evidence of unconnected, prejudicial hearsay statements in the absence of a ruling by the trial court that a conspiracy existed. Vincent acknowledges that the acts and declarations of coconspirators in furtherance of the conspiracy are admissible against another defendant, even when made out of the latter's presence, and that such acts and declarations may be admitted as exceptions to the hearsay rule. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968; *People v. Morrow* (1976), 40 Ill. App. 3d 1020, 353 N.E.2d 354.) Vincent claims, however, that no act performed or declaration made prior to the

beginning or after the termination of the conspiracy is admissible against a nondeclaring co-conspirator. (*People v. Meisenhelter* (1942), 381 Ill. 378, 45 N.E.2d 678.) Error is claimed in the trial court's failure to make a determination as to the limits of the conspiracy and in its failure to rule that those conversations which were admitted had been made in furtherance of the conspiracy, noting that the information and the State's responses to discovery motions asserted that the conspiracy was operative from March 23 to March 30, 1976.

■■ The statements complained of, to which defense objections were made but rulings reserved, were those which McCue testified took place between himself and Jenkot on January 28, 1976, concerning the establishment of a selling price for PCP; the February 1976 conversations between McCue, Jenkot and Vaisvilas, in which prices and quantities were discussed; and during the February PCP transaction between Vaisvilas and McCue. None of these conversations, Vincent contends, were tied up to or linked with Vincent and were hearsay and prejudicial to him. We cannot agree. Pretermitting Vincent's failure to secure an ultimate ruling by the trial court as to rulings previously reserved, as well as his failure to specifically raise this point as error in his written motion for a new trial (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), the evidence reveals preliminary discussions in which Jenkot and Vaisvilas referred to "my guy" and, later, as "Sonny"; and the March 7 telephone call from Vaisvilas to McCue on a conference setup from Vincent's house, in which Vincent participated as "Sonny" and discussed the possibility of trading five pounds of PCP for a trailer of television sets. These conversations substantially demonstrated Vincent's early involvement in the conspiracy, leading to his call to McCue on March 29, at a number which McCue had given to Vaisvilas 20 minutes earlier, arranging for the sale of up to four pounds of PCP, one-half pound at a time, and the overwhelming evidence linking Vincent to the transfer of PCP from his car to Vaisvilas for which the latter gave him McCue's $5,000 that Vincent threw out of his automobile window while speeding on the Eisenhower Expressway. This evidence revealed Vincent's involvement in the conspiracy beyond a reasonable doubt, and far beyond the requisite *prima facie* showing referred to in *People v. Olmos*. (See also *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 394 N.E.2d 883.) No formal declarations of the existence of a conspiracy was necessary under these circumstances.

With regard to the admission of conversations between McCue, Vaisvilas and Jenkot prior to March 23, it is clear from the January 28 discussions between Jenkot and Vaisvilas that McCue was being established as a potential "quantity" buyer. The February discussions involving two ounce sales also referred to buying and "doing large quantities," with a minimum of one-quarter to one-half pound of PCP. The March 6

conversations referred to McCue's "large quantity buyers" and the March 7 conference call involved a possible trade of a trailer of television sets for five pounds of PCP. The March 12 conversations related to the "big deal that was going down." These converations were connected to the ultimate transaction planned, the purchase and sale of $50,000 worth of PCP, of which the actual one pound transaction on March 30 was part of the total intended sale. The jury could properly consider these conversations as furthering the conspiracy charged and setting a necessary foundation for the conspiracy which came into full blossom between March 23 and March 30. Vincent properly could have been held, as he was, responsible for the foundation acts and conversations of his co-conspirators Jenkot and Vaisvilas. Moreover, with the furtherance of the conspiracy thus having been established, evidence of crimes committed by one or more of the co-conspirators in pursuit of the common purpose of that conspiracy are admissible to show the intent of that conspirator. *People v. Trigg* (1968), 97 Ill. App. 2d 261, 240 N.E.2d 130.

Vincent argues further that Vaisvilas' statement, "there's my guy now," when the Lincoln driven by Vincent passed him and McCue as they made their way to the undercover car with the drugs, should not have been admitted because McCue had already secured his objective, namely, possession of the drugs he was seeking from Vaisvilas; therefore, any existing conspiracy was over, he claims. Two factors, however, demonstrate that such a position cannot be sustained. First, the evidence shows that Vaisvilas still had possession of the drugs at the time he pointed to Vincent in the passing Lincoln, having then been carrying the cardboard box full of plastic PCP bags from the van to the undercover car. Delivery was not made until after Vincent had passed them and they entered the car where he "sat [*sic*] the box containing the PCP down on the floor" of the back seat of the undercover car. The second factor is that the agreement between the co-conspirators had not fully come to fruition since Vincent had decided to sell the whole pound of PCP at one time and had a remaining interest in the balance of the money due for the full pound, another $5,000.

■■ We find no error, therefore, in the admissions in evidence of the descriptions of conversations and conduct earlier than March 23, and after Vincent received the initial $5,000 payment on March 30.

## II.

Chicago Police Officer James Turney had testified that on March 6, 1976, he had been on duty in the Chicago Police Area 6 office where he saw Sergeant McCue place a telephone call. Turney had a conversation with McCue after the call was completed and the questioning then took the following course:

"Q. What did he tell you?

Mr. Levin: Objection.

The Court: Grounds?

Mr. Levin: Hearsay, at this point.

Mr. Lavine: It is not hearsay. It is not used to prove the truth of the matter. I'm showing the course of conduct.

The Court: Overruled, under those conditions.

Mr. Levin: May the jury be instructed?

The Court: The jury will be instructed not to take the conversation for the truth of the matter asserted. The jury will be instructed as follows: That this particular comment by Officer McCue, * * * is not to prove the truth thereof, but merely to show the course of conduct thereafter of Officer McCue.

Mr. Lavine: Officer, what did Office McCue tell you?

A. Officer McCue told me that Eddie Vaisvilas related to him that [he] was going—

Mr. Levin: Objection; that is double hearsay. Move to strike.

The Court: Overruled. The jury will be instructed as previously instructed.

Mr. Lavine: Continue, Officer.

A. That was after McCue had learned Mr. Vaisvilas, that Mr. Vaisvilas was going to the Connect House, the following day."

Turney then testified that he went to Vaisvilas' house on the morning of March 7, saw him enter a van and followed him to a house on Bosworth or Hamlin Avenues in Elk Grove Village. Vincent argues that the clear intent of this testimony was to arouse the jury's interest in who lived in the house in Elk Grove Village and to link Vaisvilas with Vincent and that the prejudice was fully developed when Vaisvilas subsequently testified that Vincent lived on Bosworth Avenue in Elk Grove Village. He asserts that when McCue told Turney that Vaisvilas said he was going to the "connect house," meaning supplier in popular narcotics parlance, that statement could not have been limited to the "course of conduct" exception despite the trial court's limiting instruction. Because McCue had already testified by this time, and could not have been further cross-examined by the defense as to this conversation, Vincent also claims a denial of his essential right to cross-examine, citing *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *People v. Colegrove* (1930), 342 Ill. 430, 174 N.E. 536; *People v. Harris* (1970), 128 Ill. App. 2d 256, 262 N.E.2d 99; *People v. Moretti* (1928), 330 Ill. 422, 161 N.E. 766; and *People v. Collins* (1971), 49 Ill. 2d 179, 274 N.E.2d 77.

■■ The State counters that Turney's testimony was introduced only to show why he followed Vaisvilas that day, the course of conduct exception to hearsay, not to prove the truth of the assertion that the latter was going

to the "connect house," and that the jury was properly admonished as to the limited nature of the evidence offered, relying on *People v. Marino* (1980), 80 Ill. App. 3d 657, 400 N.E.2d 491, and *People v. Sanders* (1980), 80 Ill. App. 3d 809, 400 N.E.2d 468. The use of Turney's testimony as to McCue's conversation with Vaisvilas in order to provide the reason for his conduct on March 7 goes considerably ·beyond what may have been necessary in the instant case; its introduction borders upon prejudicial error. The need to show course of conduct when balanced against potential prejudice to Vincent under such circumstances, is highly questionable. Nevertheless, in light of other evidence which overwhelmingly demonstrated Vincent's guilt as the narcotics supplier, the outcome of this case could not have been affected beyond a reasonable doubt, and must therefore be deemed harmless error.

### III.

During the conference on instructions, the State tendered two instructions as to Jenkot and Vincent, numbered 23 and 24, each of which dealt with "other crimes" based upon Illinois Pattern Jury Instructions, Criminal No. 3.14 (1968) (hereinafter cited as IPI Criminal). After objection and argument, the instructions were refused by the trial court and each was marked "denied" across the bottom half portions of each instruction. For some unexplained reason, the trial court included these instructions in his oral reading of the 26 other instructions and six forms of verdict to the jury. The defense claims that this inadvertent error was prejudicial and requires reversal, because it was defendants' prerogative to utilize or refrain from using IPI Criminal No. 3.14 and because the language contained in the instruction, "other crimes," does not identify what other crimes are being referenced.

The record does not affirmatively show whether or not the written instructions were also tendered to the jury. In *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098, a similar circumstance occurred, wherein a withdrawn instruction was nevertheless read to the jury. We held there that the error of reading an incorrect instruction was cured by the submission to the jury of correct written instructions, particularly in light of the many other jury instructions and verdict forms the jury had heard but was otherwise given in written form, thereby diminishing the probability of special attention being given to the improper instruction read inadvertently. (75 Ill. App. 3d 259, 286.) In *People v. Gomez* (1980), 80 Ill. App. 3d 708, 399 N.E.2d 1368, defendant there tendered IPI Criminal No. 3.14 and subsequently withdrew it. The trial court then inadvertently read the withdrawn instruction to the jury. The defendant objected to the reading after the jury began its deliberations; however, the trial judge was able to immediately recall the jury and fully admonish

them to disregard the instruction. Under those circumstances, the appellate court found the error harmless. (80 Ill. App. 3d 708, 713.) In the instant case, the defense did not object to the reading of the refused instructions, as was done in *Gomez*, and did not alert the trial court to what had happened until post-trial motions were filed. Whatever harm might have been incurred by the readings could have been ameliorated had the defense timely brought the error to the trial court's attention.

■■ Notwithstanding the erroneous giving of an instruction which had earlier been refused, we find the error here to have been harmless in any event. The instructions were not prejudicial to the defense because evidence had been presented at trial that on February 13 and March 2, 1976, McCue had made two preliminary purchases of PCP from Vaisvilas and Jenkot. This evidence of other crimes was admissible under the theory that it had substantial, independent relevance to show motive, intent, identity and the existence of a common scheme or design. (*People v. Borawski* (1978), 61 Ill. App. 3d 774, 378 N.E.2d 255.) Neither Jenkot nor Vincent were charged with these crimes, however. The instructions regarding other crimes thus were appropriate to caution and admonish the jury as to the limited purposes of their admission, and were of probable benefit to the defense. (*People v. Niederhauser* (1930), 258 Ill. App. 564.) Although the defense argues that the giving of such instructions was at their option, based upon a committee note to IPI Criminal No. 3.13, which says that No. 3.13 should be given only at the request of the defendant, similar language does not appear with respect to IPI Criminal No. 3.14. Here, the instruction was in no way detrimental to defendants and was probably beneficial, even if the jury was able to remember the oral instructions, or had in fact received the written instructions as well. The error could not have affected the outcome of the case in any event, and was therefore harmless.

## IV.

The defense next raises as error a restriction upon closing argument of defense counsel which came when the latter commented upon the testimony of DEA Special Agent Steven Casteel who testified that although he was in a helicopter flying at a height of from 1,000 to 1,200 feet, he could see things clearly, down to inch-long boxes. Casteel had testified, "I saw him remove a small brown object from the trunk," in reference to Vincent's activities. Defense counsel argued that Casteel, having been flying high above the City at that time, was a liar. To this argument, the State's objection was sustained. Defense counsel went further in his argument and stated that because Casteel testified that the helicopter was at a height where he could differentiate between a foot, 10 inches or a lesser degree, "the man lied." The State's objection to the last

quoted argument was also sustained and the court directed "the jury is to disregard any testimony as to lieing [*sic*]." The defense claims that Casteel's testimony provided the only direct link between Vincent, Vaisvilas and the drugs and because defense counsel was prohibited from fully commenting on the evidence and "denied the opportunity to express an opinion about the credibility of Agent Casteel, the defendants were deprived of a fair trial and the convictions should be reversed and remanded for a new trial" citing *People v. Gray* (1964), 52 Ill. App. 2d 177, 201 N.E.2d 756, *rev'd on other grounds* (1965), 33 Ill. 2d 160, 210 N.E.2d 486; *People v. Carr* (1969), 114 Ill. App. 2d 370, 252 N.E.2d 912.

■■ The State claims that defense counsel was expressing his personal opinion as to the credibility of a witness in calling Casteel a liar (*People v. Hardy* (1979), 77 Ill. App. 3d 37, 395 N.E.2d 743), and that the trial court was clearly correct when he sustained objections to defense counsel's argument. It is improper for counsel to state that a witness or defendant had lied in his testimony unless he states, or it is apparent, that that statement is based solely upon the evidence. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880; *People v. Hoffman* (1948), 399 Ill. 57, 64-65, 77 N.E.2d 195; *People v. Valdery* (1978), 65 Ill. App. 3d 375, 379, 381 N.E.2d 1217; *People v. Gray*; *People v. Carr*.) In making his comment, defense counsel had the right to scrutinize and comment upon the credibility of the evidence in view of the facts and the inferences that may be drawn from them (*People v. Kirk* (1966), 36 Ill. 2d 292, 222 N.E.2d 498); however, his comments here transcended the scrutinization of the evidence and available inferences in the inflammatory remarks made relative to Casteel as a liar, particularly in view of the fact that his observations concerning Casteel's view from the helicopter omitted an important aspect of that testimony, namely, that Casteel was observing the scene with the use of binoculars. In any event, other evidence, namely the testimony of Agent Morley, Officer Geraci and Vaisvilas, directly linked Vincent with the drugs in a cardboard box removed from the trunk of his car, which the jury had the right to consider in conjunction with Casteel's testimony. Therefore, denial of the right to call Casteel a liar or to eliminate the term lying from the jury's consideration as to his testimony could not have been prejudicial to the defense and provides no basis for reversal under all the evidence in the case.

## V.

■■ The defense next argues that the court erred in convicting and sentencing defendants for both calculated drug conspiracy and conspiracy. The State concedes that judgment and sentence was improperly entered on both charges since conspiracy is clearly one of the elements of calculated criminal drug conspiracy. (Ill. Rev. Stat. 1977, ch. 56½, par.

1405.) Therefore, the judgments and sentences for conspiracy as to both Jenkot and Vincent must be reversed and vacated. *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.

## VI.

Defendant Jenkot was charged, tried and convicted of calculated criminal drug conspiracy under section 405(b) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, par. 1405(b)) in that on or about March 23-30, 1976, he participated in and organized a conspiracy which delivered 444.9 grams of phencyclidine (PCP). Jenkot claims that he neither participated in nor prepared for any transaction on March 30, 1976; was not connected with Vincent or Vaisvilas on that day or days earlier; was not present at or near Central Avenue and the Eisenhower Expressway on March 30, or shared any part of any plan of Vincent and Vaisvilas that day; and his convictions for conspiracy should therefore be reversed, citing *Grunewald v. United States* (1957), 353 U.S. 391, 1 L. Ed. 2d 931, 77 S. Ct. 963. Jenkot argues that McCue had not seen him after March 23, and, although McCue testified to having a telephone conversation with Jenkot on March 29, that latter conversation in which Jenkot asked, "when is it going down? and, "what is it set for?" demonstrates that Jenkot had no direct knowledge of the transaction and was attempting to glean such information from McCue. Without knowledge of or participation in the crime, Jenkot claims that he cannot be guilty of the conspiracy charge.

The record reveals that McCue first met Jenkot in the tavern on January 28, 1976. When McCue told him that he was interested in purchasing PCP, Jenkot gave McCue a card with his telephone number on it and told him he had access to "multiple ounces" of PCP and almost any kind of drug he was interested in. McCue met Jenkot again on February 12, when Jenkot introduced him to Vaisvilas and the purchase of narcotics was again discussed, this time concerning two ounces for which Jenkot quoted a price of $1,400. Vaisvilas said that his people could do "multiple ounces" of PCP and McCue responded that "his guy" was capable of one-quarter to one-half pound minimum. McCue said he would get back to Jenkot in the morning because he had to contact "his guy" for the money. On February 13, McCue called Jenkot at the number the latter had given him and told him he was ready to "go" on the two ounces and later called back and said he could purchase only one ounce that day because of a money problem. Jenkot called McCue back and informed him that Vaisvilas would "do the ounce" that afternoon, and that transaction was in fact consummated. At the time of the sale, Vaisvilas told McCue that anytime he wanted drugs he should contact

Jenkot who would get in touch with him. After the transaction, Vaisvilas testified that he transmitted $600 of the $700 to Vincent and $50 to Jenkot for setting up the deal. On March 20, McCue talked to Jenkot about the purchase of another ounce and thereafter Jenkot exchanged PCP for $700.

On March 12, McCue met Vaisvilas and Jenkot at the former's home and this time Jenkot asked McCue for $500 for past arrangements and as an advance for the further deal about which McCue had come to discuss, but McCue told him he would be taken care of when "the big deal went down." The parties also discussed prices for narcotics at this meeting. On March 23, McCue and his partner took Jenkot and Vaisvilas to the safety deposit box where they were shown $50,000 in $100 bills and Jenkot again asked for $500 but was told he would be taken care of later. It was here that Vaisvilas said they would do four pounds of PCP, one-half pounds at a time, McCue stating he would rather complete the transaction in two steps and Vaisvilas told him he would get back to him a few days later. Vaisvilas testified that McCue had told him and Jenkot that they would get $2,000 after that deal was accomplished. On March 29, after McCue called Vaisvilas and told him he was ready to purchase up to four pounds of PCP and the latter asked for McCue's number, first Vincent called McCue at that number and prices, delivery and amounts were thereafter discussed, and later Jenkot called McCue at the same number. Notwithstanding Vaisvilas' request to McCue not to tell Jenkot of the *mechanics* of the deal because he was "whacked," Vaisvilas testified that Jenkot was to receive his $1,000 anyway and that of the $1,000 profit to be received by Vaisvilas from McCue, 40 percent was to go to Jenkot.

From the foregoing the jury could well have found that Jenkot, Vincent and Vaisvilas were indeed co-conspirators in a plan to sell and deliver the quantity of PCP with which the participants in the conspiracy were charged. Jenkot could have been deemed by the jury as one of the organizers of the drug transaction, having established contact with McCue, and assessed him as a "quantity" buyer, having introduced McCue to Vaisvilas, having given McCue his business card and discussed prices with him, and in having viewed the $50,000 during discussions of the sale of four or five pounds of PCP, in which he participated. Vaisvilas' statement to McCue that anytime he wanted drugs he should talk first to Jenkot who would get hold of him revealed Jenkot's close contact with the transactions.

■■ Jenkot's claim that he could not be guilty of participation in the conspiracy because he was not physically present on March 30 when Vaisvilas gave McCue the box of PCP does not relieve him of responsibility for that transaction. When, as here, the evidence reveals that a conspiracy has been entered into, each conspirator becomes liable for the acts of his co-conspirators done in furtherance of the conspiracy (*People*

*v. Burleson* (1977), 50 Ill. App. 3d 629, 365 N.E.2d 1162), whether or not he is present at the time of the consummation of the act which has been planned. (*People v. Walinsky* (1921), 300 Ill. 92, 132 N.E.2d 757; *United States v. Harris* (7th Cir. 1966), 358 F.2d 279.) The offense of calculated criminal drug conspiracy with which Jenkot was charged also continued until the overt acts in furtherance of its purchase had been completed, in this instance, the payment of money and the delivery of PCP on March 30, 1976. (*People v. Perry* (1961), 23 Ill. 2d 147, 177 N.E.2d 323.) This is not a case where mere association with a conspirator has taken place, as in *United States v. Basurto* (9th Cir. 1974), 497 F.2d 781, and *United States v. Arroyave* (5th Cir. 1973), 477 F.2d 157, or mere knowledge or acquiescence without agreement is involved (*United States v. Butler* (10th Cir. 1974), 494 F.2d 1246), as Jenkot urges. *Chavez v. United States* (9th Cir. 1960), 275 F.2d 813, also cited by Jenkot, does not aid him since in that case no evidence supported the conclusion that one of the defendants, Abel, was involved in the conspiracy. Other authorities cited by Jenkot are equally inapposite. We find no error in the verdict or judgment as to Jenkot, which we are compelled by the evidence to affirm.

## VII.

The defense contends that the trial court erred in its sentencing of Vincent and Jenkot because it failed to consider statutory sentencing factors; because the court considered facts not in the record, which were highly inflammatory and prejudicial; and because the court erred by imposing an excessive sentence on each of the defendants.

■■ As to the first alleged sentencing error, defendants' contention relates to the absence in the record of the trial court's consideration of each of the factors set out in the aggravation and mitigation provisions of sections 5—5—3.1, 5—5—3.2 and 5—4—1(a)(3) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3.1, 1005—5—3.2 and 1005—4—1(a)(3)). The defense contends that nowhere in the trial court's remarks prior to sentencing did it indicate that it considered the above cited statutory provisions, the grounds therein, or any grounds in mitigation whatever. Upon these omissions, the defense predicates reversible error. The record reveals, however, that each defendant elected to be sentenced under the prior law. At the hearing, both court and counsel were in receipt of the presentence reports and a full hearing in aggravation and mitigation was then held. Because defendants chose to be sentenced under the prior law, the sentencing judge was not required to state his reasons on the record for the sentences imposed as required by the new sentencing act. In making the election, defendants' choice was between alternative sentencing schemes, not specific sentences. (*People v. Peoples* (1979), 71 Ill. App. 3d 842, 390 N.E.2d 554.) A defendant cannot select portions of

each act he wishes to have applied to his circumstances. Defendants in having elected to be sentenced under the old act cannot now argue that the trial court should have followed the provisions of the new act. (*People v. Green* (1980), 86 Ill. App. 3d 852, 857, 408 N.E.2d 479; *People v. Milam* (1980), 80 Ill. App. 3d 245, 252, 399 N.E.2d 703.) We find no error in the trial court's procedure.

The defense next points to a discussion by the State's attorney of the effects of phencyclidine as an hallucinogenic drug, asserting that the court had read newspapers, medical specials and had become aware of the nature and substance of such a drug and what it does to the human body. The prosecutor also read from a report of the "Dangerous Drug Commission,"[2] at which time the court interrupted and said, "for what it's worth, I will let you refer to that; proceed." The prosecutor then proceeded to read certain emergency room statistics and facts about current use of drugs and concluded that PCP "is a most dangerous substance" and "a highly dangerous and toxic drug." Thereafter, the trial court stated, among other things, that the drug on some occasions had been known to cause the user to drown in an inch of water, others to pull out their eyeballs and do other bizarre things, to cause schizophrenia and other such terrible debilitating effects upon the human body. The court then sentenced the two defendants.

In determining the degree of punishment to be imposed following conviction, a court is not bound by the usual rules of evidence but may search within reasonable bounds for facts tending to show aggravation or mitigation of an offense. (*People v. Cook* (1975), 31 Ill. App. 3d 363, 334 N.E.2d 834.) The court must consider the nature of the offense, the need of society for protection and the rehabilitative potential of the individual defendant. (*People v. Dawson* (1975), 33 Ill. App. 3d 768, 338 N.E.2d 425.) The information discussed by the assistant State's attorney and the trial court was general and not specifically referenced to either defendant as in the cases they cite. (See, *e.g.*, *People v. Gant* (1974), 18 Ill. App. 3d 61, 309 N.E.2d 265, in which the trial judge considered a robbery as a contributory factor to the death of the victim two days after the robbery, which the court said it took into consideration in sentencing that defendant, and *People v. Maldonado* (1980), 80 Ill. App. 3d 1046, 400 N.E.2d 656, in which a guard was beaten and died following a jailbreak involving that defendant, which the court took into consideration in sentencing.) A trial court nevertheless must be circumspect with regard to those matters which it will consider in a sentencing hearing.

■■ In the present case, the potential dangers to the community of

---

[2] Pamphlet, National Clearing House for Drug Abuse.

narcotics are matters of which the General Assembly has taken specific notice, wherein at section 100 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, par. 1100), the General Assembly has recognized the rising incidents in the abuse of drugs and other dangerous substances and resultant damage to peace, health and welfare of the citizens of Illinois and included phencyclidine in Schedule III(d)(10) (Ill. Rev. Stat. 1977, ch. 56½, par. 1208(d)(10))[3] as being among those drugs intended to be more effectively controlled by penalizing "* * * most heavily the illicit traffickers or profiteers of controlled substances, who propogate and perpetuate the abuse of such substances with reckless disregard for its consumptive consequences upon every element of society." (Ill. Rev. Stat. 1977, ch. 56½, par. 1100(3).) The legislature went on to indicate that among the types of offenses it deemed most damaging to the peace and welfare of Illinois citizens, which warranted the most severe penalties, included "offenses involving unusually large quantities of controlled substances, as measured by their wholesale value at the time of the offense" (Ill. Rev. Stat. 1977, ch. 56½, par. 1411(2)). The sale of one pound of PCP for $10,000 most assuredly fits that category in the case at bar. The trial court must be presumed to have had knowledge of these legislative findings and policies in its consideration of the drug offense of which defendants were convicted, and the sentences are supportable by these considerations without reference to the potential harmful effects on individuals of defendants' criminal conduct. See, *e.g.*, *People v. Childers* (1980), 83 Ill. App. 3d 358, 361-62, 403 N.E.2d 1295.

■■ Defendants Vincent and Jenkot maintain that they were given excessive sentences in light of the nature of their offenses and in contrast with the sentences received by Vaisvilas, a co-conspirator. Vincent was the obvious supplier of PCP from which he derived a large monetary profit. He engaged in the conspiracy which supplied Sergeant McCue with one pound of PCP in exchange for an agreed price of $10,000. When sold in smaller quantities, the impact upon the community would be widespread. Jenkot, although not a supplier under the facts, clearly played an important role in organizing the sale in "large" quantities right from the first contact he had with Sergeant McCue. We cannot say that the sentences of the trial court under the foregoing circumstances was an abuse of his discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

■■ With respect to the comparison of defendant's sentences with that recommended by the State's attorney for Vaisvilas, namely, a sentence of 2 to 6 years imprisonment, a trial court may properly grant leniency in sentencing a defendant who by his plea insures prompt and certain

---

[3] Now listed within Schedule II(e)(6). Ill. Rev. Stat. 1979, ch. 56½, par. 1206(e)(6).

application of correctional measures as to him, acknowledges his guilt, shows a willingness to assume responsibility for his conduct, and cooperates, as in this case, in the successful prosecution of the offenders. (*People v. Massarella* (1979), 80 Ill. App. 3d 552, 573, 400 N.E.2d 436.) We find no error in the sentencing aforesaid and accordingly affirm.

For the foregoing reasons we are compelled to sustain the jury findings that Vincent and Jenkot were guilty of calculated criminal drug conspiracy and affirm the judgments and sentences entered thereon. We reverse and vacate the judgments as to each said defendant with regard to conspiracy.

Affirmed in part, reversed in part and conspiracy sentences vacated.

PERLIN, P. J., and DOWNING, J., concur.