**People of the State of Illinois, Plaintiff-Appellee, v. William Trigg, Otherwise Called William Brady (Impleaded), Defendant-Appellant.**

Gen. No. 51,613.

First District, First Division.

June 10, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall J. Hartman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Francis T. Carey, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

The defendant, William Trigg, and Emil Bratu were charged jointly in an indictment filed on January 18, 1965, with having "committed the offense of sale of purported narcotic drug, in that they unlawfully offered to sell a narcotic drug to Stephen R. Hnatt for lawful money of the United States of America, and then sold to Stephen R. Hnatt a quantity . . . of a non-narcotic substance, otherwise than as authorized in the Uniform Narcotic Drug Act of said State of Illinois then in force and effect, in violation of Chapter 38, Section 22–40, of the Illinois Revised Statutes 1963. . . ." The defendant, William Trigg, pleaded not guilty and after a trial was found guilty by a jury. The Court sentenced him to a term of not less than seven nor more than ten years in the State Penitentiary. The defendant has ap-

pealed from the finding of guilty and the judgment entered thereon.

The defendant contends on appeal: (1) that section 22–40 does not charge a public offense because said section is headed "Penalties" thereby not adequately apprising a prospective defendant as to what conduct on his part will render him criminally liable for its violation; (2) that section 22–40 is violative of article IV, section 13 of the Illinois Constitution in that the title of the section and its subject matter relate to different matters; (3) that the failure of the trial court to grant defendant's motion for a severance was an abuse of discretion thus denying defendant a fair trial; and (4) that the evidence adduced at trial clearly left a reasonable doubt as to his guilt.

On September 8, 1964, after a meeting arranged by a department informer, Stephen R. Hnatt, an inspector in the Division of Narcotic Control of the State of Illinois, and one Walter Brown, they drove to the intersection of Wellington and Sacramento in Chicago. Brown got out of the car and met with Emil Bratu who was waiting on the corner. After he engaged in a short conversation with Bratu, Brown returned to the car and handed Hnatt a cigarette package containing heroin. Later, on that same day, Hnatt and Brown again drove to the intersection of Wellington and Sacramento. On this particular occasion Bratu threw a bag containing heroin onto the seat next to Hnatt and said, "Can you take more next time? I don't like to go through this for just one." Hnatt replied that if he was satisfied with the heroin he would purchase more the next time, and he handed Bratu $700 in payment.

On September 27, 1964, Hnatt met with Bratu at the Awe-Com-On-Inn at 2165 North Clybourne. Hnatt asked Bratu if the latter could sell him one-half kilogram of heroin. Bratu replied that he could.

On September 29, 1964, Hnatt again met with Bratu at the Awe-Com-On-Inn. Bratu requested Hnatt to advance him the money for the heroin, but Hnatt refused to do so. On the same date, Charles Adams, another inspector for the Division of Narcotic Control, who had Bratu under surveillance, observed Bratu leaving a green and white 1958 Buick in front of 3040 West Wellington.

On the evening of September 30, 1964, Hnatt met with Bratu at the latter's apartment which was located at 3040 West Wellington. Bratu attempted to call his "man," referring to his source of supply, but failed to get an answer. Later in the evening Bratu received a phone call. After a short conversation, Bratu told Hnatt that he was supposed to meet his "man" on the corner at ten o'clock that evening. He described his supplier as being a man named Bill, a Negro, who lived with a white girl named Audrey at around 84th and Rhodes. After Bill had failed to appear when Bratu thought he was supposed to, Bratu told Hnatt that he had been mistaken and the meeting was set for ten o'clock in the morning.

On the morning of the following day, October 1st, Hnatt and Adams prepared a list of $5,750 in official advance funds at division headquarters, and Hnatt took the money with him on his way to meet Bratu. That same morning Inspector Adams observed the aforementioned Buick in the vicinity of Wellington and Whipple streets; the car appeared to be "cruising" in the area, and was being driven by William Trigg, defendant, with Bratu as a passenger. When Hnatt arrived at Bratu's apartment the latter told him that he had heard from Bill and he was to meet his supplier in a short time. Whereupon he left the apartment, returning in about fifteen minutes. During the fifteen minutes' interlude Bratu and Trigg were observed by several division inspectors. They were seen together, driving around the area in the Buick and conversing with each other. After Bratu returned to his

apartment he told Hnatt that the arrangements had been completed, and that he was to meet his "man" at 3:00 p. m. at the 50th On The Lake Motel, located at 50th and South Shore Drive on Chicago's south side. Hnatt agreed to pick Bratu up and to pay half of the money in advance. Bratu gave Hnatt a bottle of opium and an envelope of heroin. He told Hnatt to pay him later in the evening.

The defendant was observed by division inspectors arriving at the motel at about 2:30 p. m. in the green and white Buick which he parked. He seated himself in the motel's coffee shop and was joined at his table by one Edward Tishel. Around three o'clock Bratu and Hnatt arrived at the motel in the latter's car and Hnatt parked the car at the rear of the motel's restaurant, at a spot which could not be seen from the coffee shop. The defendant and Tishel got up. They went outside and seated themselves in the Buick. Shortly thereafter, Bratu, who had already been given the prerecorded funds by Hnatt, walked over and got into the Buick with the other two men. Bratu and the defendant talked for a while. Bratu then got out of the Buick carrying a package wrapped in newspaper under his arm. The defendant sped away. Bratu walked back to Hnatt's car and gave Hnatt the package he was carrying. He said, "Here's the thing, man. Bill decided not to rent a room." Bratu was then placed under arrest. In the meantime, the defendant's car had been curbed by several Division of Narcotic Control Inspectors. The defendant emerged from the car holding $3,700 of the prerecorded funds in his hand and was arrested. Bratu was found to have $2,050 in his possession.

The package that Bratu handed to Hnatt was found to contain a white nonnarcotic powder. After Trigg had been arrested and taken to the division headquarters, Inspector Paul Hemphill stated to Trigg, "I thought you wasn't dealing in dope." Trigg answered, "All they got is a big fat turkey, just wait until they put the acid to it

and you'll see." Trigg then explained to the inspector that the reason he had sold Hnatt a nonnarcotic substance, referred to as a "turkey," was that he knew something "was not right," and that he was "running it through" first to see what would happen.

The first contention raised by the defendant is that the section of the Criminal Code under which he was convicted inadequately informed him that the behavior in which he was engaging was subject to criminal sanctions. The relevant portions of the section in question are as follows:

§ 22–40. Penalties . . .

Whoever agrees, consents, or in any manner offers to unlawfully sell, prescribe, administer, transport, dispense or give any narcotic drugs to any person, or offers, arranges, or negotiates to have any narcotic drugs unlawfully sold, prescribed, administered, transported, dispensed or given, and then sells, prescribes, administers, transports, dispenses or gives, or offers, arranges, or negotiates to have sold, delivered, transported, furnished, administered, dispensed or given to any person any non-narcotic liquid, substance or material shall be imprisoned in the penitentiary for any term from 1 year to 10 years. (Ill Rev Stats 1963, c 38, § 22–40.)

■■ Defendant's basic argument is twofold: in the first place, he contends that because the section is headed penalties one must assume that it deals only with the subject matter announced in its heading, and therefore, it does not set forth any provisions of substantive law that can be violated; and secondly, he asserts that the provisions of the section under which he was convicted (the second paragraph of section 22–40) are void for uncertainty and vagueness because the heading of the section did not inform him of what behavior he would be held criminally liable for. As to the defendant's first point, it is obvious, in spite of it's heading, that section

269

22–40 does contain provisions of substantive law, and does not deal only with the subject of penalties. In the interpretation of the meaning of a particular section the plain meaning of the substantive provisions of the section cannot be limited by its heading. Railroad Trainmen v. B. & O. R. Co., 331 US 519. The plain language of the section clearly sets forth a public offense.

■ Nor can we agree with the second part of defendant's argument. The second paragraph of section 22–40 is directly related to the overall purpose of the Uniform Narcotic Drug Act, within which it is located, i. e., the control of illicit traffic in narcotics; and the meaning of the section is clear, adequately describing the practices to be avoided. People v. Calcaterra, 33 Ill2d 541, 213 NE2d 270. Therefore, neither the language nor purpose of the second paragraph of section 22–40 were so vague as to fail to inform the defendant of what behavior would be unlawful.

■ Defendant's second contention, that section 22–40 is violative of article IV, section 13 of the Illinois Constitution, was raised before our Supreme Court in People v. Calcaterra, 33 Ill2d 541, 213 NE2d 270. In Calcaterra the court held that the purpose of section 22–40 was reasonably related to the purpose of the Uniform Narcotic Drug Act and therefore, section 22–40 was not unconstitutional.

Thirdly, the defendant contends that the trial court's denial of his motion for severance, made prior to trial, was an abuse of discretion "because of the admission of evidence and exhibits of other crimes, of a different nature and classification from the one charged in the indictment, allegedly committed by the co-defendant Bratu solely, at a time directly remote from the date of the indictment." In particular, defendant objects to the introduction in evidence of various exhibits pertaining to narcotic sales consummated between Bratu and Hnatt,

as well as to statements made by Bratu outside the presence of defendant which tended to implicate him as Bratu's supplier.

 Persons jointly indicted may be tried together, and the granting of a severance is largely discretionary with the trial court. People v. Henderson, 37 Ill2d 489, 229 NE2d 519. In assessing the trial judge's exercise of discretion the primary question is whether or not the defenses of the several defendants were so antagonistic that their being tried together denied one of them a fair trial. People v. Connolly, 33 Ill2d 128, 210 NE2d 523. In the instant case, both the defendant and Bratu pleaded not guilty, and neither man testified. No confessions by either man implicating his codefendant were introduced. Therefore, the trial judge did not abuse his discretion in denying defendant's motion for a severance. See People v. Grilec, 2 Ill2d 538, 119 NE2d 232.

The defendant argues, however, that the State's proof of its case against Bratu by its very nature made it impossible for him to receive a fair trial when tried along with Bratu. At trial the State introduced into evidence the narcotics sold by Bratu to Hnatt on September 8th along with those to be paid for later given to Hnatt on the morning of October 1st. The trial judge, at the close of the State's case, instructed the jury to disregard the State's exhibits pertaining to the sales of September 8th as to the defendant, but he allowed them to consider the evidence from October 1st as to him. The defendant contends that the court erred in allowing the jury to consider the evidence of the October 1st sale as to him, and by not instructing the jury to disregard evidence of the September 8th sale as to him when it was first introduced. He further contends that this evidence tended, in the eyes of the jury, to prove him guilty of Bratu's earlier sales, and that he was prejudiced thereby.

271

■ ■ The essence of the State's case against the defendant lay in the proof of a partnership existing between him and Bratu for the purpose of selling a purported narcotic, with the defendant as the supplier and Bratu as the party responsible for finding prospective customers. Where the proof of a conspiracy depends upon isolated acts and events the acts of one of the conspirators may be admitted in evidence before sufficient proof of the conspiracy has been given pending the future production by the State of adequate evidence to show the conspiracy's existence. Spies v. People, 122 Ill 1, 12 NE 865. Therefore, the trial judge in the case at bar did not err in withholding his ruling on defendant's objections to the admission of evidence of Bratu's earlier sales until he could determine whether the State could prove the existence of a partnership between the defendant and Bratu to sell a purported narcotic.

■ At trial, the State did show the existence of such a conspiracy. Both the defendant and Bratu used the same car and were seen conversing in it. Bratu referred to his supplier as a man named Bill, a Negro, who lived with a white girl named Audrey at 84th and Rhodes. The defendant's name is Bill, he is a Negro, and evidence was introduced tending to show that he lived with a white girl named Audrey at 84th and Rhodes. When the transfer of the purported narcotic was effected Bratu entered the Buick where the defendant was waiting and got out carrying a package containing a nonnarcotic substance. When the two men were arrested both possessed a portion of the prerecorded money, clearly indicating some sort of financial partnership. Under these circumstances the trial judge was justified in finding at the close of the State's case that the State had established by testimony concerning isolated facts and events that a conspiracy did exist between the defendant and Bratu.

Once a conspiracy has been shown evidence of other crimes committed by one of the conspirators in furtherance of the common purpose of the conspiracy is admissible against the other conspirators. People v. Novotny, 371 Ill 58, 20 NE2d 34. Proof of such other crimes may tend to show the intent of the conspirators. ILP, Criminal Law, § 441. In the instant case the evidence of Bratu's earlier sales of narcotics was admissible against the coconspirators as a way of showing a course of conduct designed to convince Hnatt that he was receiving real narcotics on October 1st; the deceit of Bratu and the defendant was a principal element of the offense with which they were charged. People v. Steele, 22 Ill2d 142, 174 NE2d 848. The trial judge ruled correctly in allowing the jury to consider the evidence of narcotics given by Bratu to Hnatt on October 1st for the State's other evidence had established the existence of a conspiracy between the defendant and Bratu by that time.

Defendant cites People v. Baxter, 74 Ill App 2d 437, 221 NE2d 16, in support of his proposition that evidence of Bratu's earlier narcotic sales prejudiced his case before the jury. In Baxter, the defendant was indicted for the sale, and conspiracy to sell, narcotic drugs. The court held therein that testimony of the party who purchased the drugs from the defendant, that he had also purchased narcotics from the defendant on prior occasions, was prejudicial because it had no other purpose than to show defendant's propensity to commit the crime charged. The court pointed out, however, citing the Steele case, that the evidence complained of did not show a design on the part of the defendant, which would have brought it within a recognized exception to the rule which generally excludes evidence of past offenses. In the instant case the defendant was not indicted for unlawful sale of narcotics, but rather he was charged with

the sale of a purported narcotic drug. Under these circumstances, as pointed out in Steele, evidence of prior sales may be admissible as a means of showing a plan to deceive a prospective customer. Moreover, in the case at bar, the evidence of Bratu's earlier sales was admissible to demonstrate the purpose of the conspiracy in which both he and the defendant were involved.

Defendant also contends that the court erred in admitting into evidence conversations between Hnatt and Bratu held outside of his presence in violation of the hearsay rule, and that "these conversations were prejudicial and inflammatory, and their admission constituted reversible error." In particular he objects to a conversation between Hnatt and Bratu held on September 30th, at which time Bratu stated that his "man" was named Bill, and that he was a Negro living with a white girl named Audrey at 84th and Rhodes.

██ ██ The declarations or admissions of one of the members of a conspiracy made in the furtherance of the common purpose is admissible against the other members even though a conspiracy is not alleged in the indictment. People v. Parson, 27 Ill2d 263, 189 NE2d 311. The statements made by Bratu to Hnatt concerning the identity of his supplier were all admissible against the defendant because they were made in furtherance of the conspiracy in that they were designed to deceive Hnatt into believing that he was dealing with an established partnership whose sole purpose was the procurement and sale of actual narcotics; whereas, in reality, the purpose of the conspiracy was to "set up" Hnatt for the sale of a purported narcotic.

In People v. Brown, 83 Ill App2d 457, 228 NE2d 505, cited by defendant, the accused was indicted for the sale of narcotics. The court there held that certain statements of a third party damaging to the accused and made outside of his presence were improperly admitted

in that they constituted hearsay and were highly prejudicial. Whereas in Brown no issue as to a conspiracy was raised, in the instant case, the admissibility of statements made outside of the presence of the accused depends upon their being made in furtherance of a conspiracy. Therefore, we find Brown to be distinguishable.

██ ██ The defendant's final contention is that he was not proved guilty of the offense charged beyond a reasonable doubt. He argues that because the State did not prove by direct evidence the actual physical transfer of the purported narcotic between him and Bratu, his conviction cannot stand, arguing that "mere presence at the scene of a crime is not sufficient to constitute one a principal." While we are in accord with this latter point we cannot agree that it is applicable to the facts in the instant case.

The evidence clearly revealed that the defendant who was under constant surveillance waited in the coffee shop of the motel for Bratu and Hnatt to arrive. After their arrival, the defendant went outside and entered his car. Bratu, who had already received the prerecorded funds from Hnatt, came over empty-handed and entered the Buick; and after a short conversation with the defendant, Bratu got out of the car carrying a nonnarcotic substance wrapped in a newspaper which he gave to Hnatt. At this point, defendant drove rapidly away. After his arrest, the defendant emerged from the Buick clutching a portion of the prerecorded funds in his hand. Furthermore, defendant admitted, after his arrest, that Hnatt had been sold a "turkey" because he wanted to test Hnatt's identity as a bona fide purchaser. The foregoing facts conclusively established that the defendant had actively participated in a planned violation of section 22–40. Therefore, the jury's finding that defendant had been proved guilty beyond a reasonable doubt of selling a purported narcotic was justified.

The judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

ADESKO and MURPHY, JJ., concur.