**In re Henry Robert FULLOP, Debtor.**

**Gibson D. KARNES, Appellant– Cross Appellee,**

v.

**SALEM NATIONAL BANK, Appellee– Cross Appellant.**

**Civ. No. 90–4243.**

United States District Court, S.D. Illinois, Benton Division.

Nov. 14, 1991.

Roger L. Vetter, Jones, Ottesen, Feickert, Derango & Vetter, Belleville, Ill., Robert E. Shaw, Mitchell, Neubauer & Shaw, P.C., Mt. Vernon, Ill., for appellee-cross appellant.

Terrell L. Sharp, Mt. Vernon, Ill., Charles E. Jones, McLeansboro, Ill., for Trustee.

## OPINION

FOREMAN, Chief Judge:

Before the Court are cross appeals from a Memorandum and Order and Judgment entered by the Bankruptcy Court on September 14, 1990. 125 B.R. 536. Because the order was entered in a case or proceeding referred to the bankruptcy judge under 28 U.S.C. § 157 (1988), this Court has jurisdiction to hear the appeals under 28 U.S.C. § 158 (1988).

### I. BACKGROUND

At issue in this case is whether the bankruptcy trustee can use his "strong arm"

powers under 11 U.S.C. § 544(a) to recover payments made to the Salem National Bank for oil extracted under oil and gas leases in which the bank held a security interest. The case was submitted to the bankruptcy court on stipulated facts, as follows:

On February 1, 1985, the debtor, Henry Fullop, executed two promissory notes payable to the order of the Salem National Bank. The notes, which were renewals of prior notes, were for $207,194.59 and $488,098.33. One of the notes granted the bank a security interest in "[v]arious oil and gas leases, and any and all collateral now or hereafter in the Bank's possession." The other note granted the bank a security interest in "[a]ssignments of various oil and gas leases now owned or hereafter acquired in the possession of the bank."

This note further stated that it was "[i]ssued pursuant to and entitled to the benefits of Security Agreements dated 12/29/82 and 9/30/82."

The security agreements identified in the note granted the bank a security interest in "assignments of the following Oil & Gas Leases" and listed certain leases by name and lease number.[1] In furtherance of the security agreements, the debtor executed and delivered to the bank a series of assignments of working interests in the oil and gas leases listed in the security agreements.[2] The debtor also executed transfer and division orders that directed the pipeline companies that purchased oil from the leases to pay the proceeds attributable to the debtor's interest to the bank for the debtor's account.[3]

1. The specific leases were identified as:

| | | | |
|---|---|---|---|
| Venters–Staton Comm. 1 | # 741C | Thelma Worrell # 1 | # 52679 |
| Rister Comm. # 1 | 781C | Carl Short # 1 & # 2 | 10465 |
| Kenneth Short # 1 | 800C | Carl Short # 3 & # 4 | 10531 |
| Smothers Comm. # 1 | 897C | Ralph English # 1 | 23742 |
| Etienne Commn. # 1 | 927C | King Mattingly | 3913 |
| Robinson # 2 | 928C | King–Carrier | 3932 |
| Simpson # 1, # 2, & # 3 | 975C | Elmer Emmerson | 2115 |
| Unknown | 2123 | | |

2. The assignment for the Etienne Community # 1 lease in White County, Illinois, is typical of these transactions. In relevant part, the assignment states:

> KNOW ALL MEN BY THESE PRESENTS: That the undersigned, Henry Fullop, of Carmi, Illinois 62821, hereinafter called Assignor, for and in consideration of Ten and no/100 dollars ($10.00) and other valuable consideration, ... does hereby sell, assign, transfer and set over unto SALEM NATIONAL BANK for Account of Henry Fullop, hereinafter called Assignee, a ⅛th working interest in and to the following described oil and gas leases, covering lands situated in White County, Illinois, towit: 1. Oil & Gas Lease dated April 10, 1980, from Burnedine Etienne and Richard Etienne, her husband ..., Lessors, to Henry Fullop, Lessee, recorded in Book 145, Pages 493–495 of the records of the White County Recorder; and

> . . . . . .

> INSOFAR as the above leases cover the following described land; The Southeast Quarter of the Northwest Quarter (SE ¼ NW ¼) of Section Twenty (20), Township Three (3) South, Range Eight (8) East, containing forty (40) acres, more or less;

> . . . . . .

> together with the rights incident thereto and the personal property thereon, appurtenant

> thereto, or used or obtained in connection therewith.

> . . . . . .

> This Assignment shall be effective as of September 1, 1981.
> EXECUTED this 30th day of September, 1981.
> s/Henry Fullop

3. Again, the transfer order for the Etienne Community # 1 lease is typical. The order to Rock Island Refining Corporation, dated December 8, 1981, showed Henry Fullop as "transferor" and stated:

> We, the undersigned, hereby certify and warrant that we have transferred, as indicated below, oil production from the ETIENNE COMM. # 1 located in the County of White, State of Illinois described as follows: SE ¼ NW ¼ Section 20–3S–8E, White County, Illinois Effective September 1, 1981, and until further written notice from either party, Rock Island is authorized to purchase, ... the oil produced from the above lease and to make payments therefor as follows:
> To whom transferred:
>   Salem National Bank A/C Henry Fullop
> Division of Interest:
>   .09570313 [Working Interest].

The bank recorded all of the assignments in the recorder's office of the various counties in which the oil and gas leases were located. The bank also filed a UCC–1 financing statement in the office of the Secretary of State of Illinois, showing a security interest in several items of machinery and equipment used in oil and gas production. A UCC–3 continuation statement was filed on December 17, 1984. Other than these two documents, the bank did not file any other financing statements in the Secretary of State's office or elsewhere.

Pursuant to the transfer and division orders, the pipeline companies that purchased oil from the various leases began paying the appropriate share of the proceeds directly to the bank. Prior to the debtor's bankruptcy, the bank applied the funds to the debtor's notes and remitted any balance to the debtor. However, after the debtor filed for bankruptcy on September 30, 1985, the bank paid the operating expenses attributable to the assigned working interests and applied the remainder of the funds to the debtor's obligations under the notes.

The debtor, acting as debtor-in-possession under his original Chapter 11 bankruptcy proceeding, commenced an adversary proceeding in March 1988 to avoid the bank's security interest in the oil and gas leases. The complaint alleged that the debtor could avoid the security interest under 11 U.S.C. § 544(a)(1) and, as a result, the debtor's estate was entitled to recover the debtor's interest in the leases as well as the proceeds paid to the bank on those leases subsequent to the filing of the debtor's bankruptcy petition.

The bankruptcy trustee was substituted as plaintiff in the adversary proceeding when the debtor's case was converted to a Chapter 7 proceeding in January 1989. The trustee has conceded that the bank has a valid and perfected security interest in the working interests described in the security agreements and assignments. However, the trustee argues that the security interest applies only to the oil still in the ground and does not extend to the production machinery and equipment or to the oil and gas following its extraction.

The bankruptcy court held that the bank, by recording the assignments of the debtor's working interest in the oil and gas leases, had obtained a perfected security interest in the leaseholds as well as in the extracted oil and accounts from all but two of the leases. The court found that the bank's interest in the oil extracted from the Carl Short # 3 and # 4 was unperfected because the assignment was recorded more than five years prior to the debtor's bankruptcy and no continuation statement was filed. The court also found that the bank's lien on the machinery and equipment used on the leaseholds was unperfected. As a result, the court held that the trustee could avoid the bank's liens on the machinery and equipment and that the bank must account to the trustee for oil payments collected from the Carl Short # 3 and # 4 leases.

On appeal, the trustee argues that the bankruptcy court erred in finding that the bank had fulfilled all of the Uniform Commercial Code (UCC) requirements to obtain a perfected security interest on the extracted oil and proceeds from all of the leases other than the Carl Short # 3 and # 4. The bank, in its cross-appeal, argues that the UCC is inapplicable to the transactions. Thus, the bank contends that it is entitled to retain the proceeds from all of the leases. The bank has not appealed the bankruptcy court's ruling on the machinery and equipment. Therefore, any issue regarding perfection as to the machinery and equipment is waived. *MortgageAmerica Corp. v. Bache Halsey Stuart Shields, Inc.,* 789 F.2d 1146, 1151 (5th Cir.1986); *In re Narowetz Mechanical Contractors, Inc.,* 99 B.R. 850, 857 n. 14 (N.D.Ill.1989), *aff'd,* 898 F.2d 1306 (7th Cir.1990).

## II.  ANALYSIS

In a bankruptcy appeal, the bankruptcy court's findings of fact "shall not be set

aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013. *See also In re Excalibur Auto. Co.,* 859 F.2d 454, 458 (7th Cir.1988); *In re Evanston Motor Corp.,* 735 F.2d 1029, 1031 (7th Cir.1984). However, where questions of law are concerned, the district court will review the bankruptcy court's ruling *de novo. In re Sanderfoot,* 899 F.2d 598, 600 (7th Cir.1990), *rev'd on other grounds,* —— U.S. ——, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991); *In re Evanston Motor Co.,* 735 F.2d at 1031.

As mentioned above, this case centers on the bankruptcy trustee's "strong arm" powers under 11 U.S.C. § 544(a)(1) (1988), which provides that

> [t]he trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such creditor exists....

In other words, the Court must decide whether the trustee, having the status of a hypothetical judicial lienholder, takes priority over the bank's security interest in the oil extracted under the various oil and gas leases. To resolve this question, the Court must determine whether the bank has a perfected or unperfected interest in the extract oil and proceeds.

The trustee has conceded that the bank obtained a valid and perfected security interest upon the debtor's oil and gas leases by recording the assignments of those leases in the proper county recorder's office. The trustee argues, however, that the bank's perfected security interest applies only to the oil and gas in the ground. Once the oil is extracted, the trustee contends that it becomes personal property subject to the perfection requirements of Article 9 of the Uniform Commercial Code (UCC), Ill.Rev.Stat. ch. 26, ¶¶ 9–101—9–507. The trustee argues that the bank has not satisfied the Article 9 perfection requirements for personal property.

The bank, on the other hand, argues that the UCC is inapplicable because the transactions involve real property. If the extracted oil does constitute personal property, the bank argues in the alternative that it has fulfilled the requirements of the UCC.

### A. Application of the UCC

The scope of Article 9 of the UCC is set forth in section 9–102(1), which provides that "[e]xcept as provided in Section 9–104 on excluded transactions, this Article applies (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts...." Ill.Rev.Stat. ch. 26, ¶ 9–102(1)(a).

Section 9–104 lists interests that are excluded from the provisions of Article 9. Pertinent to this case is section 9–104, which provides that "[t]his Article does not apply ... to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder...." *Id.* ¶ 9–104(j).

The difficulty in this case arises from the fact that oil and gas interests may be characterized as both real property and personal property. Illinois courts historically have recognized that oil and gas in place "belong to the owner of the land so long as they remain under the land." *Miller v. Ridgley,* 2 Ill.2d 223, 117 N.E.2d 759, 761 (1954). Thus, the Illinois Supreme Court has stated that "[o]il and gas leases granting the right to search for and take oil and gas are freehold estates in the land." *Jilek v. Chicago, Wilmington & Franklin Coal Co.,* 382 Ill. 241, 47 N.E.2d 96 (1943). "[T]he right to explore for these substances and to reduce them to possession, if found, is a valuable part of [a land-

**632**

owner's] property. It is an interest in the land springing out of his ownership of everything above and below the surface." *Id.* at 249, 47 N.E.2d at 100.

Once the oil is extracted from the ground, however, Illinois law characterizes it as personal property. *Piersol v. Bendum Trees Oil Co.*, 2 F.R.D. 133, 134 (E.D.Ill.1941). Thus, "under the law of Illinois, oil in place is part of the real estate and the right to remove it a 'corporeal hereditament,' but when severed from the soil, it becomes personal property belonging to the owner of the real estate...." *Id.; see also Meadowlark Farms, Inc. v. Illinois Pollution Control Bd.*, 17 Ill. App.3d 851, 308 N.E.2d 829, 835 (5th Dist. 1974) ("[M]inerals severed from the land with the intent they be removed become personalty belonging to the owner of the mineral estate.").

In this case, the debtor executed an assignment of a fractional "working interest" in the oil and gas leases. As the bank points out, a working interest is real property under Illinois law. *Fry v. Farm Bureau Oil Co.*, 3 Ill.2d 94, 119 N.E.2d 749, 750 (1954) ("The working interest has been held by this court to be a freehold interest."). Thus, there is no question that the bank obtained a perfected security interest in the working interests by filing the assignments of those interests in the real estate records. The issue in this case, however, is whether the perfected security interest applies only to the oil in place, or whether it also extends to the oil upon its extraction from the ground.

This question is resolved by examining the Illinois Supreme Court's interpretation of the term "working interest."

In the oil industry it appears that the words 'working interest' have come to have an accepted meaning, namely, that an assignment of a three-fourths working interest means the assigning of a three-fourths of the portion of the oil and gas that may be produced from the premises after the royalty for the share paid to the landlord is first deducted. In *Robinson v. Johnson*, 119 Kan. 639, 240 P. 962 [ (1925) ], the court there described a working interest as being the interest of the lessee under an oil and gas lease after the royalty has been deducted.

*Illinois Nat. Gas & Oil Co. v. Sinclair*, 373 Ill. 581, 27 N.E.2d 450, 451 (1940); *see also Bates v. Mansfield*, 212 Ill.App.3d 69, 156 Ill.Dec. 73, 75, 570 N.E.2d 549, 551 (5th Dist.1991) ("The term 'working interest', as used in connection with an oil and gas lease, refers to the portion of the oil and gas that may be produced from the premises after the royalty for the share paid to the landlord is first deducted."). Under this definition, a "working interest," like an oil and gas lease, grants the right to explore for oil and, if found, reduce it to possession. Once extracted, however, the oil becomes the personal property of the owner of the working interest.[4]

The distinction between oil in place and oil upon extraction is explicitly recognized in the Illinois General Assembly's enactment of the UCC. Section 9–105(1)(h) of the UCC states that " '[g]oods' includes all things which are movable at the time the

---

**4.** Some courts have described a "working interest" as "a fractional portion of the oil and gas produced from a well after an amount (such as an 'overriding royalty,' 'oil payment,' 'net profit interest,' or 'carried interest') is retained for the lessor." *Sackett Enterprises, Inc. v. Staren*, 211 Ill.App.3d 997, 156 Ill.Dec. 226, 229–30, 570 N.E.2d 702, 705–06 (1st Dist.1991). This definition of "working interest" arguably could include the oil upon extraction as well as the oil in place. But such a broad definition would be contrary to the firmly established principle in Illinois that once oil and gas becomes personal property once it is severed from the ground.

In the Court's view, the *Sackett Enterprises* description is not intended to be a legal defini-

tion of what constitutes a working interest—i.e., *Sackett Enterprises* does not require the Court to find that oil extracted under a working interest is real property. Rather, the description is based upon the fact that a "working interest" cannot be quantified until the oil is actually produced. In other words, although the owner of a 7⁄8ths working interest has a real property interest in 7⁄8ths of the oil in place, this interest cannot be measured until the oil is actually reduced to possession by being pumped out of the ground. Thus, the oil is considered personal property upon extraction, but the proceeds from its sale are divided up according to the various fractional interests in the leasehold.

security interest attaches ..., but does not include ... minerals or the like (including oil and gas) before extraction." Ill.Rev. Stat. ch. 26, ¶ 9–105(1)(h). By negative implication, section 9–105(1)(h) indicates that minerals following extraction are personal property to which Article 9 does apply. Moreover, as the bankruptcy court pointed out, the UCC contains several provisions which expressly relate to perfection of security interests which attach to oil "as extracted." *See id.* ¶¶ 9–103(5), 9–401(1)(b), 9–402(1), and 9–403(7). Thus, the UCC codified the pre-extraction and post-extraction dichotomy established by the state courts.

It is important to note, however, that the UCC not only recognized this distinction, but went on to establish specific rules for perfecting a security interest in the oil once it becomes personal property. As a result, the UCC supersedes prior case law that suggested that the recording of an assignment of a working interest is sufficient to perfect a lien on oil produced from the lease.

This interpretation of the UCC is supported by the Kansas Supreme Court's decision in *Ingram v. Ingram*, 214 Kan. 415, 521 P.2d 254, 260 (1974), which stated that "[o]il and gas are considered to be part of the real estate until they are extracted; then they immediately change from realty to personalty. It is upon extraction that the law pertaining to security interests in personal property comes into play." Similarly, UCC scholars agree that while the UCC generally does not apply to a mortgage on an oil and gas lease, "[i]t is clear that the oil and gas mortgage intersects with Article 9 insofar as it seeks to pursue the minerals and their proceeds after extraction, when they become personal property." B. Clark, The Law of Secured Transactions Under the UCC ¶ 13.01 at 13–3 (2d ed. 1988).

Even though interests in unextracted minerals are generally excluded from Article 9, the typical oil and gas mortgage chases the minerals out of the ground and extends to the proceeds of sale at the wellhead; these proceeds are known in the industry as "the runs." The oil and gas financer will also seek to include the equipment on the site as part of the total package. With respect to these personal property elements of the mortgage, Article 9 applies with a vengeance. *Id.* ¶ 13.02[5], at 13–7 to 13–8.

■ Based upon this analysis, the Court agrees with the bankruptcy court that Article 9 of the UCC applies to security interests in oil and gas upon extraction and to accounts arising from the sale of the oil and gas. Therefore, in order to avoid the bankruptcy trustee's "strong arm" powers and retain the oil payments made under the assigned leases since the debtor filed bankruptcy, the bank must show that it fulfilled Article 9's perfection requirements for its security interest in the extracted oil.

■ The bank attempts to avoid this result by arguing that the right to payment for extracted oil depends upon who holds title to the leasehold when the oil was produced. Indeed, as the Court acknowledged above, extracted minerals become the personal property of the owner of the mineral rights. Thus, if the bank held title to the working interest, the oil extracted under that lease would be the personal property of the bank, rather than of the debtor. In that event, of course, the bank would not need to have a perfected security interest in the extracted oil in order to avoid the bankruptcy trustee's "strong arm" powers.

The bank contends that it obtained title to the debtor's leasehold interest through the recorded assignments of the debtor's working interest. The trustee, on the other hand, argues that the assignments created only a security interest and, to the extent that the security interest applied to the oil upon extraction, the security interest must be properly perfected under Article 9 of the UCC.

The language of the assignments at issue in this case appears to grant an absolute conveyance of the debtor's working interest. However, under Illinois law, the courts "may look to the substance and not the form of a transaction to determine whether a conveyance absolute in form is

in reality a mortgage." *First Fed. Sav. & Loan Ass'n of Chicago v. Pogue,* 72 Ill. App.3d 54, 27 Ill.Dec. 588, 592, 389 N.E.2d 652, 656 (2d Dist.1979); *see also* Ill.Rev. Stat. ch. 110, ¶ 15–1207 (1989) ("the term 'mortgage' includes, without limitation ... (c) every deed conveying real estate, although an absolute conveyance in its terms, which shall have been intended only as security in the nature of a mortgage...."). This principle also is recognized in UCC section 9–102(1)(a), which states that Article 9 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property...." Ill.Rev.Stat. ch. 26, ¶ 9–102(1)(a).

There can be no doubt under the stipulated facts of this case that the assignments of the debtor's working interests were made as security for the loans from the bank. The promissory notes executed by the debtor expressly granted the bank a security interest in the assignments of the working interests. In addition, the bank has acknowledged that whenever the pipeline companies made payments under the assigned working interests, the bank would apply the funds to the debtor's notes and remit any balance to the debtor. Thus, the bank treated the assignment as a method of payment of the loan. *Compare In re Joseph Kanner Hat Co.,* 482 F.2d 937, 940 (2d Cir.1973) (assignment, although absolute in form, was construed as an assignment for security subject to UCC).

Because the Court finds that the assignments created a mortgage, the legal effect of the transaction was to create a lien on the debtor's working interest, rather than transfer title to the bank. *Harms v. Sprague,* 105 Ill.2d 215, 85 Ill.Dec. 331, 473 N.E.2d 930 (1984). Therefore, the debtor remained the legal owner of the working interests and the oil extracted from the leaseholds was his personal property. Although the assignments created a security interest in the oil upon extraction, the bank was required to perfect this security interest in order to prevail over the bankruptcy trustee's "strong arm" powers.

**B. The Bank's Compliance with Article 9**

Having found that Article 9's perfection requirements were applicable to the oil extracted under the debtor's leases, the Court must determine whether the bank satisfied those requirements. The bankruptcy court ultimately held that the bank had fulfilled the functions prescribed by the UCC, although the court acknowledged that the bank's procedures "were not a model of compliance with the UCC." The bankruptcy trustee, however, contends that the court's conclusion is flawed in several respects.

The trustee first argues that the bankruptcy court erred in holding that a security interest in extracted oil can be perfected by filing the proper documents in the real estate records of the county in which the wellhead is located. Specifically, the trustee argues that the bankruptcy court improperly interpreted UCC section 9–401(1), which states:

(1) The proper place to file in order to perfect a security interest is as follows:

.    .    .    .    .

(b) when the collateral is timber to be cut or is minerals or the like (including gas and oil) or accounts subject to subsection (5) of 9–103, or when the financing statement is filed as a fixture filing (Section 9–313) and the collateral is goods which are or are to become fixtures, then in the office where a mortgage on the real estate would be filed or recorded;

(c) in all other cases, in the office of the Secretary of State.

Ill.Rev.Stat. ch. 26, ¶ 9–401(1).

The trustee argues that the bankruptcy court erroneously relied upon subsection (b) in finding that the bank correctly filed its documents in the county real estate records. The trustee contends that subsection (b) has no bearing on this case because it relates only to "minerals or the like (including gas and oil) or accounts subject to subsection (5) of 9–103...." and, in the trustee's view, section 9–103(5) is inapplicable to this case.

Section 9–103(5) provides as follows:

**(5) Minerals**

Perfection and the effect of perfection or non-perfection of a security interest which is created by a debtor who has an interest in minerals or the like (including gas and oil) before extraction and which attaches thereto as extracted, or which attaches to an account resulting from the sale thereof at the wellhead or minehead are governed by the law (including the conflict of laws rules) of the jurisdiction wherein the wellhead or minehead is located.

*Id.* ¶ 9–103(5).

The trustee points out that the heading for section 9–103 is "Perfection of Security Interests in Multiple State Transactions." As a result, the trustee argues that subsection (5) of 9–103 applies only to cases involving interstate transactions. Because the bank, the debtor and the wellhead are all located in Illinois, the trustee contends that this case involves an entirely intrastate transaction that is not subject to section 9–103(5).

■ The Court must reject the trustee's narrow interpretation for several reasons. First, although a court may consider the title or heading of a statute as an aid to determining the legislative intent where the language of the statute is obscure or ambiguous, *People v. Malone*, 71 Ill.App.3d 231, 27 Ill.Dec. 677, 389 N.E.2d 908, 909 (2d Dist.1979), "the plain meaning of the substantive provisions of the section cannot be limited by its heading." *People v. Trigg*, 97 Ill.App.2d 261, 240 N.E.2d 130, 134 (1st Dist.1968).

There is nothing in the plain language of section 9–103(5) that suggests that the provision is limited to interstate transactions involving minerals. Rather, the provision is applicable whenever there is a security interest "created by a debtor who has an interest in minerals or the like (including gas and oil) before extraction and which attaches thereto as extracted, or which attaches to an account resulting from the sale thereof at the wellhead or minehead...." The heading merely reflects the fact that transactions in extracted minerals, by their nature, are likely to involve more than one jurisdiction.

Secondly, the UCC Comments and Illinois Code Comments make it clear that the purpose of sections 9–401(1)(b) and 9–103(5) is to make filings uniform and predictable in cases involving extracted minerals.

Subsection (5) deals with problems relating to the financing of minerals (including oil and gas) as these products come from the ground. In some cases rights in oil and gas in the ground have been split into a large variety of interests. As the oil or gas issues from the ground, it may be encumbered by the group of persons having interests therein. Or the product may be sold at minehead or wellhead and the resulting accounts assigned. The question arises as to the place of filing. The usual rule of this section in subsection (2) would make the place to search for encumbrances on the accounts the locations of the respective assignors; but the assignors might be a number of individuals located throughout the country. To avoid the difficult problems of search thus created, subsection (5) provides that the place for filing with respect to security interests in the minerals as they issue from the ground at minehead or wellhead or in the accounts arising out of the sale of the minerals at minehead or wellhead shall be in the state where the minehead or wellhead is located. Section 9–401 similarly provides that the place to file within the state is in the real property records in the county where the minehead or wellhead is located.

Ill.Rev.Stat. ch. 26, ¶ 9–103 Official Comment 8; *cf. id.* Illinois Code Comment ("The rules stated in this section may not be varied by agreement of the parties, since they affect the rights of third parties who, for example, in determining whether to extend credit to a borrower, must know where to search for prior filings.").

The Official Comment to section 9–401 indicates a clear intention to require local filing, rather than statewide filing, for security interests in extracted minerals. "It is thought that sound policy requires a

state-wide filing system for all transactions *except* the essentially local ones covered in paragraph (1)(a) ... and land-related transactions covered in paragraph (1)(b)...." *Id.* ¶ 9–401 Official Comment 4.

> Together, then, 9–103(5) and 9–401(1) telescope perfection questions to the state and county of the wellhead or minehead. This relieves the creditor from the central and perhaps other local filings typically required for ordinary inventory and accounts, not only in the state of mineral operations but in other states where debtors may be scattered.

J. White & R. Summers, Uniform Commercial Code § 24–25 (3d ed. 1988).

The trustee's interpretation of section 9–401 is contrary to this legislative intent. His reading of sections 9–401 and 9–103 would require local filing in "multiple state" transactions, but statewide filing where a purely intrastate transaction is involved. Thus, in order to determine whether prior encumbrances would be recorded at the county level or at the state level, a potential creditor would need to know whether the debtor, the wellhead, and the prior creditors are all located in the same state. This is precisely the type of problem that the UCC attempts to avoid by designating one location—the county real estate records—as the place to perfect a security interest in extracted minerals.

■ For these reasons, the Court agrees with the bankruptcy court that security interests in intrastate, as well as interstate, transactions involving extracted oil and accounts are perfected by filing in the county where the wellhead is located.

The trustee next argues that the security agreements relied upon by the bank were inadequate to grant a lien upon the extracted oil and accounts as required by UCC section 9–203(1)(b), which provides

> a security interest is not enforceable ... and does not attach unless ... the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown

or timber to be cut, a description of the land concerned.

.   .   .   .   .

Ill.Rev.Stat. ch. 26, ¶ 9–203(1)(b). The trustee contends that the security agreements in this case (1) did not expressly identify the extracted oil and accounts as collateral; and (2) failed to contain a legal description of the real estate where the leases were located.

■ The Court finds the trustee's first argument to be without merit. The Court acknowledges that the documents entitled "Security Agreement" refer only to "assignments of the following Oil and Gas leases," listing the leases by name and number. Taken by themselves, these documents arguably would not grant a security interest in the oil extracted under those leases or to the accounts attributable to such extracted oil. However, these security agreements must be read in conjunction with the promissory notes signed by the debtor in 1985 as well as the assignments themselves.

Security agreement is defined in UCC section 9–105(1)(*l*) as "an agreement which creates or provides for a security interest...." Ill.Rev.Stat. ch. 26, ¶ 9–105(1)(*l*). There is nothing in this provision which requires that the entire agreement be set forth in one document or that such a document must be expressly labeled as a "Security Agreement." Indeed, the Official Comment to section 9–203 states that

> the requirement of this section that the debtor sign a security agreement is not intended to reject, and does not reject, the deeply rooted doctrine that a bill of sale although absolute in form may be shown to have been in fact given as security. Under this Article as under prior law a debtor may show by parol evidence that a transfer purporting to be absolute was in fact for security and may then, on payment of the debt, assert his fundamental right to return of the collateral and execution of an acknowledgment of satisfaction.

*Id.* ¶ 9–203 Comment 4. Thus, the Seventh Circuit has found that an assignment, absolute on its face, constitutes a sufficient

security agreement under section 9–203 when considered together with collateral notes and other documents relating to the transaction. *Wambach v. Randall*, 484 F.2d 572 (7th Cir.1973).

In this case, as stated above, the promissory notes granted the bank a security interest in the "[a]ssignments of various oil and gas leases now owned or hereafter acquired in the possession of the bank." The notes also referred to the 1982 security agreements, which granted the bank a security interest in the assignments of the specific leases. The assignments, in turn, conveyed to the bank "a ⅛th working interest in and to the following described oil and gas leases ... together with the rights incident thereto and the personal property thereon, appurtenant thereto, or used in connection therewith...."

■ As discussed above, a working interest grants the right to explore for oil and, if found, reduce it to possession. Thus, one of the rights incident to the working interest is the right to any oil extracted under the lease and to accounts attributable to such oil. It is also important to note that the recorded assignments provided for an absolute conveyance or transfer of the working interests to the bank. By making an assignment rather than executing a mortgage on the leases, it is clear that the debtor intended to give the bank the right to payment for the extracted oil. This finding is bolstered by the fact that the debtor also executed transfer and division orders that directed the pipeline companies to make payments to the bank based upon the assignment of the working interests. Therefore, although the legal effect of the assignments was to create a security interest in the property rather than effecting an absolute transfer, the Court finds that the assignments gave the bank an interest in extracted oil and accounts as well as an interest in the oil in place.

■ The Court also rejects the trustee's argument that the security agreements failed to contain a legal description of the real estate where the leases were located. Although the documents entitled "Security Agreement" did not contain the legal description of the real estate, the recorded assignments did. Moreover, the Court notes that the UCC does not require a legal description of the real estate in transactions concerning extracted minerals. Section 9–203(1)(b) requires a description of the land when the security interest covers crops or timber to be cut. Ill.Rev.Stat. ch. 26, ¶ 9–203(1). But there is no reference to oil, gas, or other minerals. Indeed, as the Illinois Code Comment points out, the 1972 amendments to the UCC deleted the phrase "oil, gas or minerals to be extracted" from section 9–203(1). "This phrase was deleted because revised Article 9 does not recognize a security interest in oil, gas or minerals until it has been extracted from the land." *Id.* Illinois Code Comment. Therefore, the Court finds that the bank was not required to include a legal description of the real estate subject to the oil leases in the security agreements.

For these reasons, the Court concludes that the bank had an enforceable security interest in the extracted oil and accounts based upon the security agreement as memorialized in the 1985 promissory notes, the 1982 security agreements, and the recorded assignments of the debtor's working interests.

■ The trustee's final argument is that the bank failed to file a financing statement that complies with the requirements of section 9–402. However, the Court agrees with the bankruptcy court that the recorded assignments of the debtor's working interests sufficiently fulfilled the functions of a financing statement.

As a general matter, section 9–402(1) states that

A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral.

*Id.* ¶ 9–402(1). The section goes on to state, however, that financing statements covering "minerals or the like (including oil and gas) or accounts subject to subsection (5) of Section 9–103" must also comply with section 9–402(5), which provides:

> A financing statement covering timber to be cut or covering minerals or the like (including oil and gas) or accounts subject to subsection (5) of Section 9–103 ... must show that it covers this type of collateral, must recite that it is to be filed in the real estate records, and the financing statement must contain a description of the real estate. If the debtor does not have an interest of record in the real estate, the financing statement must show the name of a record owner.

*Id.* ¶ 9–402(5).

The bankruptcy court found, and this Court agrees, that the recorded assignments of the debtor's working interests satisfied these requirements. Although the assignments did not recite that they were to be filed in the real estate records, the bankruptcy court noted that the assignments were in fact recorded there so that the purpose of this requirement is met. This finding is consistent with section 9–402(8), which provides that "[a] financing statement substantially complying with the requirements of this Section is effective even though it contains minor errors which are not seriously misleading." *Id.* ¶ 9–402(8).

The trustee correctly points out that "[t]he essence of the Uniform Commercial Code's perfection scheme is notice." Trustee's Reply Brief at 19 (emphasis in original). However, the trustee erroneously contends that the recorded assignments of the debtor's working interests failed to notify potential judgment creditors, bona fide purchasers, and bankruptcy trustee that the bank claimed an interest in the oil produced from the working interests. As discussed above, the assignments appeared absolute on their face. Thus, the notice given to any potential creditor or purchaser was that the bank owned these interests and, as such, was entitled to its share of the oil produced under these leases.

Therefore, although the legal effect of the assignments was to create a security interest rather than an absolute transfer, the assignments provided adequate notice the bank claimed an interest in the extracted oil and accounts.

The trustee does not specifically challenge the bankruptcy court's finding that the assignments substantially complied with the requirements of section 9–402. Rather, the trustee attacks the bankruptcy court's ruling that the assignment can be construed as both a security agreement and a financing statement. This argument is contrary to the express provision in section 9–402(1) that "[a] copy of the security agreement is sufficient as a financing statement if it contains [the information required by this subsection] and is signed by the debtor." *Id.* ¶ 9–402(1). In this case, the bankruptcy court found that the assignments substantially complied with section 9–402's requirements for financing statements and with section 9–203's requirements for security agreements. Therefore, the bankruptcy court correctly ruled that the assignments could serve both as the security agreement and the financing statement.

The trustee also argues that the assignments were not recorded in the proper place in the county records. The trustee apparently contends that the assignments should have been filed and indexed in the *UCC records* of the county in which the wellheads were located. However, section 9–403(7) clearly provides for filing and indexing in the county's *real estate* records.

> When a financing statement covers timber to be cut or covers minerals or the like (including oil or gas) or accounts subject to subsection (5) of section 9–103, ... the filing officer shall index it under the names of the debtor and any owner of record shown on the financing statement in the same fashion as if they were the mortgagors in a mortgage of the real estate described, and, to the extent that the law of this State provides for indexing of mortgages under the name of the mortgagee, under the name of the secured party as if he were the mortgagee thereunder, or where the indexing is by

description in the same fashion as if the financing statement were a mortgage of the real estate described.

*Id.* ¶ 9–403(7). Therefore, the Court concludes that the bank properly filed its assignments of the debtor's working interests in the real estate records of the various counties where the wellheads are located.

### III.  CONCLUSION

Based upon the foregoing analysis, the Court finds that the Salem National Bank fulfilled the Uniform Commercial Code requirements to perfect its security interest in oil extracted from all of the assigned working interests except for the Carl Short # 3 and # 4 leases.  As a result, the bankruptcy trustee cannot use the "strong arm" powers under 11 U.S.C. § 544(a) to recover payments made to the bank for such extracted oil.  Accordingly, the bankruptcy court's judgment in these proceedings is AFFIRMED.

IT IS SO ORDERED.